**UNITED STATES DISTRICT COURT**
**FOR THE**
**SOUTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| **M.B.**, a minor by and through her next friend, Kanwar Singh Bedi | Case No. 3:13-cv-00241-DPJ-FKB |
| *Plaintiff,* | |
| v. | |
| **Rankin County School District**, **and** **Charles Frazier**, Individually and in his Official Capacity as Principal of Northwest Rankin High School, | |
| *Defendants.* | |

## MEMORANDUM BRIEF IN SUPPORT OF

## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

## I.   INTRODUCTION AND STATEMENT OF FACTS

M.B., the plaintiff in this action (the "Plaintiff"), has brought suit by and through her next friend, Kanwar Singh Bedi, against the Rankin County School District (the "School District") and Charles Frazier ("Principal Frazier," and, together with the School District, the "Defendants"), the principal of Northwest Rankin High School (the "School"). The suit challenges the constitutionality of the Defendants' practice of staging assemblies (the "Christian Assemblies"), held on campus and during school hours, that include proselytizing and prayer directed at the student audience. As will be shown herein, these school events violate the Establishment Clause. By this motion, the Plaintiff asks this Court to enjoin the Defendants' de facto policy and practice of presenting, or permitting to be presented, religious assemblies at schools in the School District.

The School began holding the religious assemblies at issue on April 9, 2013, when it sponsored the first of four Christian Assemblies delivered by members of the Pinelake Baptist Church for each grade level, beginning with the senior class. Each assembly was held during the school day on School grounds and was supervised by School employees. Each assembly included the same Christian video and a similar religious discussion, proselytizing sermon, and prayer. For the first two assemblies, attendance was mandatory. The second assembly, which took place on April 10, was for the junior class and was the one that the Plaintiff was required to attend. On April 19 and April 22, the School held the third and fourth assemblies, which were for the freshman class and sophomore class, respectively. See Amended Complaint, Dkt 5, ¶¶ 10-31.

*The Senior Christian Assembly.* On April 9, Principal Frazier sent an e-mail message to all faculty members at 8:04 a.m. instructing them to send students to a mandatory assembly in the Performing Arts Building ("PAB"). The School did not inform the students what the presentation at would be about or who would be delivering it. The students were only told that attendance was required. Once the students and faculty arrived in the PAB, a student member of the Pinelake Baptist Church (the "Church Representative"), started to give a presentation about finding hope in Jesus Christ. After about a minute of introductory comments, the Church Representative played a video for the students. The video profiled four young men it claimed had once led troubled lives. The presentation described how the teens had fallen into behaviors such as drug use, sex, self-cutting, and contemplating suicide. About five minutes into the video, each of the speakers explained how turning to God and Jesus Christ solved their problems and recommended that other people turn to Jesus as well. The video concluded with applause from the audience, which

included teachers and administrators.  The Church Representative then told the students that Jesus could help them too, and launched into a proselytizing sermon about the supposed miracles and power of Jesus Christ.  He urged those in the audience who were non-Christians to "just be open" to Jesus.  He closed with a Christian prayer.  At no time did any School official turn off the video or ask the speaker to stop proselytizing or praying.  Instead, they required all students to attend and then went so far as to stand near the exit door and prevent students from leaving.  The School's truancy officer ("Officer White") instructed students who attempted to leave to sit back down.  *Id.* at ¶¶ 32-76.

*The Junior Christian Assembly.*   On April 10, the School held a similar mandatory assembly for the junior class, consisting of the same video and a similar sectarian presentation. This assembly also took place during homeroom.  The students were called out of class sometime around 9:40 a.m. and were told to go directly to the PAB.  The School did not inform the students of the nature of the presentation beforehand.  Because the Plaintiff was informed by some of her senior friends that the assembly would be a proselytizing Christian presentation, she and a few of her friends attempted to go to the library or another classroom to study.  However, Officer White intercepted them and required them to remain in the PAB for the assembly.  The Plaintiff was also pressured to attend by the teachers who were supervising the assembly. *Id.* at ¶¶ 77-89.

The assembly began with opening remarks by a Church Representative who mentioned in his introduction that he had spoken with Principal Frazier a few months prior about putting on the Christian Assemblies, and that they had worked together to develop their theme.  After the introduction, the lights were dimmed and the Christian video started.  Once the video ended, one of the Pinelake Baptist Church members who had appeared in the video walked up to the stage and delivered a presentation to the students.  This presentation was substantially the same as the one delivered to the senior class.  It involved extensive Christian proselytizing and ended with a sectarian prayer.  According the Plaintiff, "the assembly became a sermon; lecturing that we could only find hope through the existence of Jesus Christ."  During the presentation, some students attempted to leave upon discovering the religious nature of the assembly, but they were barred from exiting by School staff.  *Id.* at ¶¶ 90-129.

*The Freshman and Sophomore Assemblies.*  On April 11, the American Humanist Association sent a letter to Principal Frazier informing him that the Christian Assemblies were unconstitutional and asked that they be stopped.  However, on Friday April 19, and Monday April

22, the School held the freshman and sophomore Christian Assemblies, respectively.   The assemblies consisted of a similar Christian presentation and the same video. They were similarly held on school property during school hours and were monitored and supervised by faculty and staff.  These assemblies were also announced by the School through the official e-mail system.  *Id.* at ¶¶ 130-144.

## II.   A PRELIMINARY INJUNCTION IS WARRANTED

The Plaintiff is entitled to a preliminary injunction if she demonstrates the following: (i) irreparable injury if the injunction is not issued; (ii) that the threatened injury to her outweighs any harm the injunction might cause to the Defendants; (iii) that the injunction will not disserve the public interest; and (iv) a likelihood of success on the merits.  See e.g. *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 278 (5th Cir. 1996), *cert. denied*, 519 U.S. 965 (1996) (holding that a school's policy of permitting student-initiated prayer at both compulsory and non-compulsory school events, including assemblies, violated the Establishment Clause and finding that the injunction standard was met).[1]   In this case, preliminary injunctive relief is warranted because all four factors weigh heavily in favor of the Plaintiff, as demonstrated below.

### A.  <u>The Plaintiff will suffer irreparable harm if an injunction is not granted.</u>

The Plaintiff clearly satisfies the first element of the test for granting an injunction because a violation of First Amendment rights, as is alleged here, "unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  This includes violations of the Establishment Clause.   See e.g. *Ingebretsen*, 88 F.3d at 280; *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006), *cert. denied*, 556 U.S. 1167 (2009) (holding that an allegation of "a violation of the Establishment Clause" is "sufficient, without more, to satisfy the irreparable harm prong."); *Parents' Assoc. of P.S. 16 v. Quinones*, 803 F.2d 1235, 1242 (2d Cir. 1986) (violation of Establishment Clause "unquestionably constitutes irreparable injury").[2]

---

[1] See also *Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 163 (5th Cir. 1993) (*Duncanville I*); *Doe v. Duncanville Indep. Sch. Dist.*, 70 F.3d 402, 407 (5th Cir 1995) (*Duncanville II*) (school officials' supervision of student-initiated and student-led prayers preceding basketball games violated Establishment Clause).

[2] See also *S.D. v. St. Johns County Sch. Dist.*, 632 F. Supp. 2d 1085, 1096 (M.D. Fla. 2009) (issuing injunction to enjoin school-sponsored religious assemblies, explaining that the "Plaintiffs' loss of rights guaranteed to them by the Establishment Clause . . . constitutes irreparable injury."); *Ingebretsen v. Jackson Pub. Sch. Dist.*, 864 F. Supp. 1473, 1491 (S.D. Miss. 1994) (holding that "plaintiffs have adequately demonstrated that they will suffer irreparable injury if the school-prayer statute is not enjoined").

**B.  The Defendants will not suffer any harm if an injunction issues.**

In contrast to the *per se* harm that the Plaintiff will suffer if the School continues to violate the Establishment Clause by holding Christian Assemblies, the Defendants will suffer no harm at all if this Court issues an injunction.  Governmental actors are not harmed by an injunction that requires them to follow their pre-existing duty to comply with the Constitution.  See e.g. *Ingebretsen,* 88 F.3d at 280; *Duncanville I*, 994 F.2d at 166 (stating that if the plaintiff's "Establishment Clause rights have been infringed, the threat of irreparable injury to the [plaintiff] and to the public interest that the [Establishment Clause serves] are adequately demonstrated"); *Newsom v. Albemarle County Sch. Bd.*, 354 F. 3d 249, 261 (4th Cir. 2003) (a government entity "is in no way harmed by issuance of a preliminary injunction which prevents it from . . . [acting in a way] which is likely to be found unconstitutional").[3]  In this case, because the Defendants are likely to be found in violation of the Establishment Clause, *infra*, they will suffer no cognizable harm from an order of this Court requiring them to stop.

**C.  Upholding constitutional rights is always in the public interest.**

The public unquestionably has an interest in ensuring that its government acts constitutionally.  See e.g. *Ingebretsen,* 88 F.3d at 280 (stating that because the challenged practice was "unconstitutional so the public interest was not disserved by an injunction preventing" it); *Giovani Carandola, Ltd. v. Bason*, 303 F. 3d 507, 521 (4th Cir. 2002) ("upholding constitutional rights surely serves the public interest"); *Borden v. Sch. Dist.*, 523 F.3d 153, 174, n.16 (3rd Cir. 2008) *cert. denied*, 555 U.S. 1212 (2009) (stating that "the public need—to prohibit Establishment Clause violations, which . . . are present in this case—is so great").[4]  In this case, it is decidedly in the public interest to prohibit the School from violating the Constitution by promoting religion to public school students by staging religious assemblies at their school.  See e.g. *Workman,* 2010 U.S. Dist. LEXIS 42813, *26-27 (preliminary injunction to prevent prayer at graduation was in

---

[3] See also *Workman v. Greenwood Cmty. Sch. Corp*., 2010 U.S. Dist. LEXIS 42813, *26 (S.D. Ind. 2010) ("The First Amendment injury to [the plaintiff] clearly outweighs the [defendant]'s minimal harm."); *St. Johns County,* 632 F. Supp. 2d at 1096 ("the harm that Plaintiffs would suffer if the [Defendant]" violates the Establishment Clause "outweighs any harm that the Defendant would suffer by being enjoined from such conduct."); *Doe v. Gossage*, 2006 U.S. Dist. LEXIS 34613, *21-22 (W.D. Ky. 2006) ("The Defendant has no legally protected interest in promoting messages of religious content at a school-sponsored graduation ceremony."); *Deveney v. Bd. of Educ.*, 231 F. Supp. 2d 483, 487 (S.D. W. Va. 2002) ("inasmuch as the defendants have no legally protected interest in promoting messages of religious content at a school-sponsored graduation ceremony, they will suffer no harm by the issuance of the temporary restraining order").

[4] See also *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002) (noting that "[c]ourts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles"); *Overruled on other grounds, Dex Media West, Inc. v. City of Seattle*, 790 F. Supp. 2d 1276, 1280 (W.D. Wash. 2011).

public interest); *Gossage,* 2006 U.S. Dist. LEXIS 34613, *22 ("The public interest in this case will be benefitted by a decision" which enjoins "prayer at the high school graduation ceremony"); *Deveney,* 231 F. Supp. 2d at 487 ("the public interest weighs in favor of protecting a student's first amendment right to be free from the unwanted intrusion of religion at a school-sponsored graduation exercise").

## III. THE PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS BECAUSE THE CHRISTIAN ASSEMBLIES VIOLATE THE ESTABLISHMENT CLAUSE.

### A. The Christian Assemblies violate the Establishment Clause.

Generally speaking, the Supreme Court has made clear that "First Amendment has erected a wall between church and state. That wall must be kept high and impregnable." *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1 (1947). To do so, "the Constitution mandates that the government remain secular, rather than affiliate itself with religious beliefs." *County of Allegheny v. ACLU*, 492 U.S. 573, 610 (1989). Specifically, the government "may not promote or affiliate itself with any religious doctrine or organization." *Id.* Courts "pay particularly close attention to whether the challenged governmental practice either has the purpose or effect of [unconstitutionally] 'endorsing' religion." *Id.* at 591. Endorsement includes "conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred." *Id.* at 593. Rather than being promoted by government, "religion must be a private matter for the individual, the family, and the institutions of private choice." *Lemon v. Kurtzman*, 403 U.S. 602, 625 (1971).

The application of these general principles to the particular issue presented in this case is does not present a novel legal issue. "Public school officials have long been prohibited by the Establishment Clause from inserting religious exercises into school activities." *St. Johns County,* 632 F. Supp. 2d at 1093.[5] Indeed, it is well-settled that school-sponsored religious activity is unconstitutional whether student participation is voluntary or compulsory and whether it is "led by students or teachers." *Herdahl v. Pontotoc County Sch. Dist.*, 933 F. Supp. 582, 591 (N.D. Miss. 1996) (stating that "[o]rganized prayer in the classroom, where students have no choice but to participate or to conspicuously 'step out in the hallway,' is unconstitutional whether led by

---

[5] See also *Lee v. Weisman,* 505 U.S. 577, 579 (1992) (prayer at graduation ceremonies unconstitutional); *Wallace v. Jaffree*, 472 U.S. 38, 48 (1985) (prayer in classrooms unconstitutional); *Stone v. Graham*, 449 U.S. 39 (1980) (Ten Commandments on classroom walls unconstitutional); *Sch. Dist. Abington Twsp. v. Schempp*, 374 U.S. 203, 205 (1963) (Bible reading before class by students unconstitutional); *Engel v. Vitale*, 370 U.S. 421 (1962) (nonsectarian prayer at beginning of school day unconstitutional); *Karen B. v. Treen*, 653 F.2d 897 (5th Cir. 1981), *aff'd*, 455 U.S. 913 (1982) (class prayers by students and teachers unconstitutional).

students or teachers") (citing *Engel*, 370 U.S. at 430; *Karen B.*, 653 F.2d at 902).  Unsurprisingly then, the courts that have addressed the issue of proselytization and/or prayer at school events have concluded that such religious activity violates the Establishment Clause.  For instance, courts have been nearly unanimous in concluding that prayers at public school graduations violate the Establishment Clause.  See *Lee*, 505 U.S. 577 (nonsectarian prayers delivered by private party at public school graduation ceremonies unconstitutional); *Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806, 816 (5th Cir. 1999), *aff'd* 530 U.S. 290 (2000); *Guidry v. Broussard*, 897 F.2d 181 (5th Cir. 1990); *Nurre v. Whitehead*, 580 F.3d 1087 (9th Cir. 2009), *cert. denied*, 130 S. Ct. 1937 (2010); *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 742 (2009); *Lassonde v. Pleasanton Unified Sch. Dist.*, 320 F.3d 979, 983 (9th Cir. 2003), *cert. denied*, 540 U.S. 817 (2003); *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1104 (9th Cir. 2000), *cert. denied* 532 U.S. 905 (2001) ("allowing the students to engage in sectarian prayer and proselytizing as part of the graduation ceremony would amount to government sponsorship of, and coercion to participate in, particular religious practices."); *ACLU v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471, 1488 (3d Cir. 1996).[6]

Other courts, including the Fifth Circuit, have already specifically held that religious assemblies held on-campus during school hours are unconstitutional.  See *Ingebretsen*, 88 F.3d at 277 (permitting "student-initiated" prayer at "compulsory or non-compulsory" school events, including "school-related student assemblies," violates the Establishment Clause); *Nartowicz v. Clayton County School Dist.*, 736 F.2d 646, 647 n.1 (11th Cir. 1984) (school district "may not authorize religion promoting assemblies"); *Collins v. Chandler Unified Sch. Dist.*, 644 F.2d 759, 760-63 (9th Cir. 1981), *cert. denied* 454 U.S. 863 (1981) (student-led prayers at school assemblies violated Establishment Clause); *St. Johns County*, 632 F. Supp. 2d at 1100 (enjoining performance of religious song at school assembly); *Golden v. Rossford Exempted Vill. Sch. Dist.*, 445 F. Supp. 2d 820, 823-825 (N.D. Ohio 2006) (concluding that school properly prevented Christian band

---

[6] See also *Warnock v. Archer*, 443 F.3d 954 (8th Cir. 2006) (affirming a contempt order on school district for violating injunction prohibiting them from orchestrating or supervising prayers at graduation ceremonies); *Workman*, 2010 U.S. Dist. LEXIS 42813, 14-15; *Gossage*, 2006 U.S. Dist. LEXIS 34613, *19-20; *Ashby v. Isle of Wight County Sch. Bd.*, 354 F. Supp. 2d 616 (E.D. Va. 2004); *Deveney*, 231 F. Supp. 2d at 485-88; *Skarin v. Woodbine Cmty. Sch.*, 204 F. Supp. 2d 1195, 1198 (S.D. Iowa 2002) (issuing injunction prohibiting school choir from singing Lord's Prayer at graduation ceremony); *Gearon v. Loudoun County Sch. Bd.*, 844 F. Supp. 1097 (E.D. Va. 1993); *Lundberg v. W. Monona Cmty. Sch. Dist.*, 731 F. Supp. 331, 333 (N.D. Iowa 1989); *Graham v. Central Cmty. Sch. Dist.*, 608 F. Supp. 531 (S.D. Iowa 1985); *Lemke v. Black*, 376 F. Supp. 87, 89-90 (E.D. Wis. 1974); *Committee for Voluntary Prayer v. Wimberly*, 704 A.2d 1199 (D.C. 1997); *Bennett v. Livermore Unified Sch. Dist.*, 193 Cal. App. 3d 1012 (1st Dist. 1987).

from playing at school assembly, reasoning that "a student assembly, held during school hours, with only one musical performer approved by the Principal, bears the imprimatur of the School" and therefore would violate the Establishment Clause).[7]  School-sponsored religious activity in the classroom and at other school functions, such as after-school athletic events, likewise violates the Establishment Clause.  See *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 303 (2000) (student-led prayers preceding school sporting events violated Establishment Clause); *Duncanville II,* 70 F.3d at 407 (same); *Duncanville I,* 994 F.2d 160 (same); *Borden,* 523 F.3d 153 (faculty participation in pre-game prayers unconstitutional); *Jager v. Douglas County Sch. Dist.*, 862 F.2d 824, 831 (11th Cir. 1989) *cert. denied*, 490 U.S. 1090 (1989) (pregame invocations violated Establishment Clause); *Doe v. Aldine Indep. Sch. Dist.*, 563 F. Supp. 883 (S.D. Tex. 1982).[8]

The courts in the foregoing cases applied the well-developed standard analysis derived from the Supreme Court's decades of Establishment Clause jurisprudence.  Claims are evaluated using "three complementary (and occasionally overlapping) tests" established by the Supreme Court.  *Santa Fe,* 168 F.3d at 816.  The first test, "and the one of longest lineage, is the disjunctive three-part *Lemon* test, under which a state practice is unconstitutional if (1) it lacks a secular purpose; (2) its primary effect either advances or inhibits religion; or (3) it excessively entangles government with religion."  *Freiler v. Tangipahoa Parish Bd. of Educ.*, 185 F.3d 337, 343 (5th Cir. 1999), *cert. denied,* 530 U.S. 1251 (2000) (citing *Lemon*, 403 U.S. at 612-13).  The second

---

[7] See also *Grove v. Mead School Dist. No. 354, 753* F.2d 1528, 1534 (9th Cir. 1985), *cert. denied,* 474 U.S. 826 (1985) ("Religious activities prohibited in public schools include . . . beginning school assemblies with prayer") (citing *Collins*, 644 F.2d 759); *Lundberg,* 731 F. Supp. at 343-344 ("in *Collins*, the court found that the primary effect of student-led prayer at a voluntary school assembly appears to be the advancement of religion.").

[8] See also *Doe v. Sch. Bd*., 274 F.3d 289 (5th Cir. 2001) (amendment to statute authorizing verbal prayer in public schools by deleting "silent" violated Establishment Clause because the clear purpose of statute was to return verbal prayer to public schools); *Doe v. Beaumont Indep. Sch. Dist*., 240 F.3d 462, 468 (5th Cir. 2001), *on remand, Oxford v. Beaumont Indep. Sch. Dist*., 224 F. Supp. 2d 1099 (E.D. Tex. 2002) (school district's "Clergy in Schools" program violated the Establishment Clause under the second prong and the endorsement test); *Hall v. Board of Sch. Comm'rs,* 656 F.2d 999, 1003 (5th Cir. 1981) (high school's morning devotional readings over public address system violated Establishment Clause); *Karen B.* at 902 (statute authorizing voluntary student-initiated prayer or teacher-initiated prayer at the start of school day held unconstitutional); *Meltzer v. Bd. of Pub. Instruction,* 548 F.2d 559, 574 (5th Cir. 1977) *aff'd on reh'g*, 577 F.2d 311 (1978) (en banc), *cert. denied,* 439 U.S. 1090 (1979) ("daily Bible reading to students in a 'captive audience' situation over the public address system each morning is violative of the First and Fourteenth Amendments"); *Herdahl v. Pontotoc County Sch. Dist.,* 887 F. Supp. 902, 908-09 (N.D.Miss.1995). Cf. *Busch v. Marple Newtown Sch. Dist*., 567 F.3d 89 (3rd Cir. 2009) (refusal by school to allow the parent of a student to read Bible verses to the class did not violate First Amendment); *Bannon v. Sch. Dist.*, 387 F.3d 1208, 1216 (10th Cir. 2004), *cert. denied* 546 U.S. 811 (2005) (school had right to restrict students free speech rights by excluding religious symbols from permanent school-sponsored mural because it could be attributed to the school itself, resulting in Establishment Clause violation); *Doe v. Wilson Cty. Sch. System*, 564 F. Supp. 2d 766 (M.D. Tenn. 2008) (prayers conducted on school property by a group of parents unconstitutional); *Carlino v. Gloucester City High Sch.*, 57 F. Supp. 2d 1 (D.N.J. 1999), *aff'd* 44 Fed. Appx. 599 (3rd Cir. 2002) (principal's involvement with a baccalaureate service was an Establishment Clause violation).

test, known as the endorsement test, "seeks to determine whether the government endorses religion by means of the challenged action." *Id.* (citing *Allegheny,* 492 U.S. at 594). Finally, the third test, "aptly named the coercion test, analyzes school-sponsored religious activity in terms of the coercive effect that the activity has on students." *Id.* at 343. State involvement with religious ideas or practices must of course pass *each* of these tests lest it violate the Establishment Clause.

In this case, the Christian Assemblies cannot pass constitutional muster under any of these tests. See e.g. *Ingebretsen,* 88 F.3d at 278-80 (policy permitting student-led religious assemblies failed the *Lemon* test, "coercion test," and "endorsement test"); *St. Johns County,* 632 F. Supp. 2d at 1092 (inclusion of a religious song at school assembly "fails to pass constitutional muster under *any* of the established tests"). There is a long line of Supreme Court cases "of considerable parentage that prohibits prayer in the school classroom or environs." *Duncanville I,* 994 F.2d at 164. This prohibition is not limited to prayers (or other religious messages) delivered by school officials themselves. "The courts have clearly ruled that inviting or encouraging students to pray violates the First Amendment." *Herdahl,* 933 F. Supp. at 591 (citing *Wallace*, 472 U.S. 38; *Karen B.* 653 F.2d at 901-02; *Ingebretsen,* 88 F.3d 274). As described in depth below, the Defendants have invited and encouraged prayer and proselytization at school-sponsored events, making it very likely that the Plaintiff will prevail on the merits of her Establishment Clause claim.

**B.   The Christian Assemblies fail the *Lemon* Test.**

**1.   *The Christian Assemblies lack a secular purpose.***

The "first prong of the *Lemon* test requires that challenged state action have a secular purpose." *Freiler,* 185 F.3d at 344. This secular purpose must be the "pre-eminent" and "primary" force driving the government's action, and "has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary County v. ACLU of Ky.,* 545 U.S. 844, 864 (2005). The Supreme Court has indicated that courts should not merely accept any purported secular rationale cooked up *post hoc* for litigation purposes by the government's attorneys. It is "the duty of the courts to distinguish a sham secular purpose from a sincere one" and not to be "a pushover for any secular claim" asserted. *Id.* Instead, courts should look with suspicion upon "statements of purpose" that are "presented only as a litigating position." *Id.* In "applying the purpose test, it is appropriate to ask whether government's *actual* purpose is to endorse . . . religion." *Jager,* 862 F.2d at 829 (internal quotations omitted, emphasis added). In this case, the only conceivable purpose the School could have had in deciding to stage the Christian Assemblies

was to spread the religious beliefs promoted by the speakers, who urged students to find hope in Jesus Christ.[9]  That is a religious, not a secular, purpose.

Several courts, including the Fifth Circuit, have specifically held that a school has no secular purpose in granting permission to students to deliver student-led prayers in school assemblies.  See *Ingebretsen*, 88 F.3d at 279 (stating that the purpose behind informing students "that they can pray at any school event so long as a student 'initiates' the prayer" cannot "be characterized as 'secular'"); *Collins*, 644 F.2d at 762 ("the invocation of assemblies with prayer has no apparent secular purpose"); *St. Johns County*, 632 F. Supp. 2d at 1100  ("Defendants are incorrect in asserting that the [religious] Song [sung at the assembly] has a valid secular purpose.").  In *Ingebretsen*, the Fifth Circuit held that a school's policy permitting student-initiated prayer at school events, including assemblies, lacked a secular purpose.  88 F.3d at 279.[10]  The school claimed its purpose was "'to accommodate the free exercise of religious rights of its student citizens in the public schools.'"  *Id*.  The court found, however, that "[r]eturning prayer to public schools is not a secular purpose."  *Id*.  The lower court opinion, which was affirmed by the Fifth Circuit, elaborated on this point specifically in regards to assemblies, explaining "that permitting students to offer [even] nonsectarian, nonproselytizing student-initiated voluntary prayer at noncompulsory school-related student assemblies" violates the *Lemon* test.  *Ingebretsen*, 864 F. Supp. at 1488.[11]

Where, as here, a school sponsors an inherently religious activity such as prayer (or a proselytizing message), even if student-led and student-initiated, it lacks a genuine secular purpose.  *Jager*, 862 F.2d at 830 (holding that a school policy that "permits religious invocations, which by definition serve religious purposes, just like all public prayers" violates the purpose prong of *Lemon*).  Simply put, an "intrinsically religious practice cannot meet the secular purpose prong."  *Id*.  See also *Holloman v. Harland*, 370 F.3d 1252, 1285 (11th Cir. 2004) (a school official's intent "to offer her students an opportunity to pray in a public school during the school

---

[9] See e.g., *Doe v. Wilson County Sch. Sys.*, 564 F. Supp. 2d 766, 793 (M.D. Tenn. 2008) (allowing  group of parents to meet once a month and pray in the cafeteria during the school day violated the *Lemon* test; reasoning "by allowing these activities, the school tacitly or overtly endorsed the group and its activities").

[10] Indeed, the court ruled that it failed "all three prongs of the *Lemon* test because its purpose is to advance prayer in public schools, its effect is to advance religion in the schools and it excessively entangles the government with religion." *Id*.

[11] The court also rejected the school's argument that the prayers were offered "to solemnize an assembly," noting: "there is nothing so momentous or singularly important about noncompulsory student assemblies that necessitates the need for solemnization." *Id*. at 1488-49.

day" lacks a secular purpose "[b]ecause prayer is 'a primary religious activity in itself'"). Recognizing "that prayer is the quintessential religious practice implies that no secular purpose" exists in school efforts to encourage or assist it. *Jaffree v. Wallace*, 705 F.2d 1526, 1534-35 (11th Cir. 1983), *aff'd* 472 U.S. 38 (1985).  See also *Duncanville I*, 994 F.2d at 164 (policy permitting pre-game basketball prayers lacked secular purpose); *Aguillard v. Edwards*, 765 F.2d 1251 (5th Cir. 1985), *aff'd,* 482 U.S. 578 (1987) (statute requiring the teaching of creation-science in public schools whenever evolution was taught violated the Establishment Clause of because the purpose was to promote a religious belief); *Black Horse Pike,* 84 F.3d at 1485; *Graham*, 608 F. Supp. at 535-36 (relying on Fifth Circuit precedent in concluding "that the invocation and benediction portions of [a school's] commencement exercises serve a Christian religious purpose, not a secular purpose.").[12]  The Supreme Court has approved this view, summarily affirming the Fifth Circuit's holding that school policies intended to permit "student" prayers at school events violated the Establishment Clause because they lacked a secular purpose.  *Karen B.*, 653 F.2d at 901, *aff'd*, 455 U.S. 913 (1982) (stating that because "prayer is a primary religious activity in itself, its observance in public school classrooms has . . . a[n] obviously religious purpose").

The Christian Assemblies challenged here are intrinsically religious, as they consist of both a proselytizing message and sectarian prayer.  A "public school prayer policy that . . . permits sectarian, proselytizing benedictions and invocations cannot pass constitutional muster." *Santa Fe*, 168 F.3d at 809.  In fact, even "allowing a student-selected, student-given, nonsectarian, nonproselytizing invocation and benediction" at school events such as assemblies is unconstitutional. *Id.*  There is no secular purpose in using the machinery of the school to promote the direction of religious speech at the student body. *Id.* at 816.  Therefore, the Defendants' policy of staging and promoting the inherently religious Christian Assemblies lacks a genuine secular purpose and consequently fails the *Lemon* test.

### 2.  *The effect of the Christian Assemblies is predominantly religious.*

The Defendants' actions regarding the Christian Assemblies fail the second prong of *Lemon* because they advance both religion in general and Christianity in particular.  *Lemon's* second prong asks whether, irrespective of the school's purpose, the practice "conveys a message of endorsement" of religion.  *Santa Fe*, 168 F.3d at 817.  Under "either the second *Lemon* prong or

---

[12] See also *Wimberley*, 704 A.2d at 1203 (striking down a voter initiative to authorize student-initiated voluntary prayer in most school-related activities as it had the "clear purpose of fostering prayer in the public schools"); *Bennett,* 193 Cal. App. 3d at 1020 (relying on Fifth Circuit precedent in finding that the inclusion of an invocation and benediction violated the "purpose" prong).

the endorsement test, the Supreme Court has cautioned that a government practice may not aid one religion, aid all religions, or favor one religion over another." *Freiler*, 185 F.3d at 346.  School assemblies, whether compulsory or non-compulsory, cannot be used to advance religion, even if the religious message is student-led and student-initiated.  *Ingebretsen*, 88 F.3d at 279.

In *Ingebretsen,* the Fifth Circuit held a statute unconstitutional which provided in part that "nonsectarian, nonproselytizing student-initiated voluntary prayer shall be permitted during compulsory or noncompulsory school-related student assemblies."  *Id.* at 277.  In doing so, the court concluded that the "statute's effect is to advance religion over irreligion because it gives a preferential, exceptional benefit to religion that it does not extend to anything else."  *Id.* at 279.  The court affirmed a district court decision which comprehensively considered the application of the statute to student assemblies, finding that the "'principal' or 'primary' effect of permitting student-initiated voluntary prayer at noncompulsory school related student assemblies appears to advance religion."  *Ingebretsen,* 864 F. Supp. at 1489.  Relevant to the court's conclusion was the fact that the assemblies were "held during instructional hours." *Id.* at 1488.

Similarly, in *Collins*, a leading case on religion in school assemblies, the Ninth Circuit held that a school policy permitting a student to open assemblies with a prayer constituted impermissible government sponsorship of religious activity under the Establishment Clause.  644 F.2d at 760-62.  The assemblies in *Collins* were organized and "conducted" by the student council and were held during the school day.  *Id.* at 760.  The student council requested permission "to open assemblies with prayer" and the principal "approved these requests."  *Id.*  The "student was free to choose the manner and words in which the prayer was delivered" and "students not wishing to attend [could] report to a supervised study hall."  *Id.*  Finding these assemblies unconstitutional, the district court issued an order permanently enjoining the school from "permitting, authorizing, or condoning the saying of public prayers by the students" at student assemblies. *Collins v. Chandler Unified School Dist*., 470 F. Supp. 959, 964 (D. Ariz. 1979).  On appeal, the school contended that "granting students permission to open assemblies with prayer . . . is a reasonable accommodation of students' religious desires."  *Collins*, 644 F.2d at 761.  Specifically, the school asserted that Establishment Clauses was not violated "by allowing voluntary, student initiated religious activity."  *Id.*  Relying on *Engel*, 370 U.S. at 430, and *Schempp*, 374 U.S. at 224-25, the Ninth Circuit flatly rejected this argument, explaining that the school's "permission for students to conduct prayers cannot be saved from constitutional attack merely because attendance at school

BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

assemblies is voluntary." *Id.* The court recognized that there is "no meaningful distinction between school authorities actually organizing the religious activity and officials merely 'permitting' students to direct the exercises" and concluded that such permission failed the *Lemon* test. *Id.*

The Christian Assemblies challenged here are similar to those found unconstitutional in *Collins* and *Ingebretsen*, except that the Defendants' assemblies are even more egregiously unconstitutional. In *Collins*, the content of the actual assemblies that followed the opening prayers was secular. The unconstitutional component was the opening prayer. The same is true of the policy in *Ingebretsen*, which extended only to prayers included in otherwise secular assemblies. 864 F. Supp. at 1488. In contrast, the Defendants have sponsored *pervasively* religious assemblies that also include prayers. Furthermore, the principal collaborated with the students from the Pinelake Baptist Church to come up with the message to be delivered at the assemblies. And, unlike in *Collins*, at least two of the assemblies here were compulsory, including the one attended by the Plaintiff. Hence, this policy goes far beyond the policies struck down in those cases and is, *a fortiori*, unconstitutional.

The fact that the speakers at the Christian Assemblies were students, rather than teachers or administrators, does not change this conclusion. It is sufficient that the Defendants *permitted* these assemblies, which directed a religious message at the student body, to occur. See e.g. *Hall*, 656 F.2d at 1003 (school violated the Establishment Clause by "permitting students to conduct morning devotional readings over the school's public address system"); *Meltzer*, 548 F.2d at 574 (school policy permitting students to read their selections from the Bible over the public address system each morning unconstitutional because it amounts to "daily Bible reading to students in a 'captive audience' situation").[13] As the Fifth Circuit has made clear, a policy permitting student-initiated sectarian prayers at a school event lacks a secular effect, noting:

> Prayers that a school "merely" permits will still be delivered to a government-organized audience, by means of government-owned appliances and equipment, on government-controlled property, at a government-sponsored event, thereby clearly raising substantial Establishment Clause concerns . . . And when the school "permits" sectarian and proselytizing prayers - which, by definition, are designed to reflect, and even convert others to, a particular religious viewpoint and which . . . do not serve . . . the permissible secular purpose of solemnizing an event - such

---

[13] See also *Goodwin v. Cross County Sch. Dist. No. 7*, 394 F. Supp. 417, 424 (E.D.Ark.1973) (striking down a very similar practice as unconstitutional).

BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

"permission" undoubtedly conveys a message not only that the government endorses religion, but that it endorses a particular form of religion.

*Santa Fe*, 168 F.3d at 817-18.[14]   The court went on to note that even when "prayers are . . . spontaneously initiated at . . . school-sponsored events, school officials are present and have the authority to stop the prayers." *Id.*[15]   At minimum, the Defendants knowingly permitted sectarian prayers and proselytization to occur at school-sponsored events, which is sufficient, without more, to render their actions unconstitutional.

This constitutional violation is heightened by the fact that the Christian Assembly attended by the Plaintiff was mandatory.   Students were told to attend by teachers and were prevented from leaving even after the outrageously proselytizing religious nature of the presentation became apparent.   Even if the assemblies had been completely voluntary, nonsectarian and genuinely wholly student-initiated, however, they still impermissibly endorsed religion.   Simply put, coercion, while sufficient to establish a violation, is not a necessary element of an Establishment Clause claim.   See e.g. *Karen B.*, 653 F.2d at 902 (policy permitting student-initiated prayers failed *Lemon's* second prong even though participation was "wholly voluntary" because "[t]his fact is not relevant to the Establishment Clause inquiry").   As the Supreme Court made clear in *Engel*, "[n]either the fact that the prayer may be denominationally neutral nor the fact that its observance on the part of students is voluntary can serve to free it from the limitations of the Establishment Clause." 370 U.S. at 430.   The Court reiterated this in *Schempp*, holding that the unconstitutionality of the religious exercises was not "mitigated by the fact that individual students may absent themselves upon parental request, for that fact furnishes no defense to a claim of unconstitutionality under the Establishment Clause."   374 U.S. at 224-25.   See also *Herdahl*, 933

---

[14] The court in *Santa Fe* refused to extend *Jones v. Clear Creek Indep. Sch. Dist.,* 977 F.2d 963, 967 (5th Cir. 1992) (*Clear Creek II*), permitting certain nonsectarian student-initiated prayers at graduations, to non-graduation events, thereby precluding student delivery of even nonsectarian prayers at other school functions such as assemblies. 168 F.3d at 823.  Importantly, the narrow graduation exception established by *Clear Creek II* has been substantially overruled by the Supreme Court's decision in *Santa F*e, 530 U.S. 290.  See *Does 1-7 v. Round Rock Indep. Sch. Dist.*, 540 F. Supp. 2d 735, 747-48 (W.D. Tex. 2007).  Even prior to *Santa Fe,* the Fifth Circuit interpreted *Clear Creek II* very narrowly as creating a "tightly circumscribed safe harbor" in the specific context of graduations, which the court had treated as *sui generis. Santa Fe*, 168 F.3d at 818.  Other courts have rejected *Clear Creek II* altogether. See *Gearon*, 844 F. Supp. at 1100; *Harris v. Joint School Dist.* No. 241, 41 F.3d 447 (9th Cir. 1994), *cert. granted, judgment vacated on other grounds*, 515 U.S. 1154 (1995) *and cert. granted, judgment vacated on other grounds*, 515 U.S. 1155 (1995) *and opinion vacated on other grounds*, 62 F.3d 1233 (9th Cir. 1995); *Workman*, 2010 U.S. Dist. LEXIS 42813, *17 (interpreting *Santa Fe* to prohibit even non-sectarian student-led prayers at graduations).  In the case *sub judice*, of course, the religious speech is extremely sectarian and occurs in a non-graduation setting, making it clearly unconstitutional (and *Clear Creek II* clearly inapposite to the analysis).

[15] See also *Graham*, 608 F. Supp. at 536 ("the invocation and benediction portions of defendant's commencement exercises have as their primary effect the advancement of the Christian religion.").

BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

F. Supp. at 588 ("[a]lthough the student members of [a religious] Club expressed their views voluntarily, the students to whom these views were broadcast did not voluntarily choose to be there . . . . Such practices over a school intercom broadcast to captive audiences of students . . . are not 'voluntary in the truest sense of the word'").[16]   Rather, "it is the act of turning over the 'machinery of the State' to the students in the religious majority to broadcast their religion which violates the Constitution." *Id*. at 589.  In *Herdahl*, the school allowed a religious club to deliver morning prayers and devotionals over a school-wide intercom system during school hours. *Id*. The court held that even if religious speech is "in the strictest sense . . . 'student-initiated,' the manner in which the [school] accommodates [them] by turning over the school public address system to be broadcast into each room, places the [school]'s seal of approval on this practice." *Herdahl*, 887 F. Supp. at 908-09.  Prayers delivered over an intercom are indistinguishable from prayers delivered in a school assembly which the entire student body is told to attend *seriatim*.  In both instances, a reasonable observer would perceive the delivery of the religious message as being endorsed by the School.

The constitutional violation in this case is also compounded by the overtly sectarian and clearly proselytizing nature of the Christian Assemblies, which sought to convince the audience to turn to Jesus Christ to solve their problems and included expressly Christian prayers.  See *Cole*, 228 F.3d at 1103 (a "sectarian invocation would have caused a more serious Establishment Clause violation than in *Santa Fe* because there the invocation was required to be 'nonsectarian and nonproselytizing.'").  The Fifth Circuit has made clear that sectarian prayers offered at school-sponsored events are *per se* unconstitutional.  *Santa Fe,* 168 F.3d at 815 (refusing to tolerate sectarian prayers in graduations, and nonsectarian prayers at football games); *Duncanville II,* 70 F.3d at 406.   Consequently, the Defendants' practice of offering such sectarian messages through the Christian Assemblies fails the second prong of *Lemon*.

### 3.   *The Defendants' actions resulted in excessive entanglement with religion.*

In addition to its unconstitutionally religious purpose and effect, the Defendants' oversight, sponsorship and control over the Christian Assemblies amounts to impermissible entanglement with religion, which is prohibited by *Lemon's* third prong.  See e.g. *Ingebretsen*, 88 F.3d at 279

---

[16] See also *Aldine*, 563 F. Supp. at 886-887 ("the fact that participation in a religious activity is not obligatory will not prevent a constitutional conflict . . . As has been emphasized repeatedly by the courts, voluntariness is not relevant to a first amendment inquiry."); *Gearon*, 844 F. Supp. at 1099 ("a constitutional violation inherently occurs when, in a secondary school graduation setting, a prayer is offered, regardless of who makes the decision that the prayer will be given and who authorizes the actual wording of the remarks.").

(holding that the "final prong of *Lemon* is also violated by [a school when] . . . representatives of the government . . . punish students who leave class or assemblies in order to avoid listening to a prayer" and also where assemblies "involved attendance by faculty or administrators"); *Duncanville II*, 70 F.3d 402 (faculty participation in student prayers unconstitutionally entangled school district with religion); *Karen B.*, 653 F.2d at 902 (statute permitting teacher-led prayers upon the request of students would result in "excessive governmental entanglement with religion" where the "exercises take place on school property during regular school hours"); *Collins*, 644 F.2d at 762 (school engaged in impermissible entanglement by permitting students to deliver prayers in school assemblies, despite the fact that the prayers "were planned and conducted by students"); *Gearon*, 844 F. Supp. at 1100 (permitting prayers to be offered during graduations amounted to excessive state entanglement with religion).[17]   In this case, the Defendants' excessive entanglement with religion is evidenced by the following facts: (1) Principal Frazier's collaboration with the students from the Pinelake Baptist Church to select the subject matter of the presentation; (2) Principal Frazier's use of the School e-mail system to announce and promote the assemblies and to tell students to attend them; (3) the attendance and supervision of faculty and administrators at the assemblies; (4) the School employees' conduct in guarding the doors to prevent students from leaving the assemblies; (5) the use of School facilities during School hours to hold the assemblies.[18]

The entanglement problem in this case is heightened by the close connection between the School District and the Pinelake Baptist Church generally.  See e.g. *Wilson County*, 564 F. Supp. 2d at 793 (holding that school's permission for a group of parents to meet once a month to pray in the school cafeteria during the school day amounted to excessive entanglement; "by allowing these activities, . . . the school became excessively entangled with the group's religious activities, and abandoned the school's constitutional obligation to maintain strict neutrality towards religion").  The student speakers at the Christian Assemblies were known by the audience,

---

[17] See also *Berger v. Rensselaer Cent. Sch. Corp.*, 982 F.2d 1160, 1171 (7th Cir. 1993), *cert denied* 508 U.S. 911 (1993) (finding excessive entanglement where non-school personnel distributed Bibles to students in classrooms); *Herdahl*, 933 F. Supp. at 597-98 ("if an evidently religious study course is taught on school grounds during regular school hours, the school is excessively entangled in it *regardless of who teaches the class*") (emphasis added); *Jabr v. Rapides Parish Sch. Bd.*, 171 F. Supp. 2d 653, 661 (W.D. La. 2001) (relying on *Ingebretsen* in finding excessive entanglement where teachers permitted non-school personnel to distribute Bibles to students; holding that "[t]eachers, who did not actively participate in Bible distribution, but merely observed non-school personnel distribute the material, became excessively entangled with religion in violation of the Establishment Clause").

[18] See *Herdahl*, 887 F. Supp. at 909 (school's practice of handing "control of the address system over to the [religious] Club for 'student-initiated' prayer [during homeroom] excessively entangles and in fact facilitates the District's involvement in religion.").

including the Plaintiff, to be members of the Pinelake Baptist Church, and the church appears to have produced the video shown at the assemblies.  The nature of this relationship goes far beyond the assemblies challenged *sub judice*, however.  Despite generally excluding outside adults from its campuses, the Defendants have granted so-called "youth ministers" from the church privileged access to roam School District lunchrooms to spread their religion to students during the school day.  Teachers at the School who are members of the Pinelake Baptist Church have openly boasted that they "speak about Christ daily" to their students.[19]  In light of the "the totality of the circumstances" showing the pervasive role of religion in general, and the Pinelake Baptist Church in particular, in its schools, the Defendants have clearly excessively entangled the state with religion in violation of the Establishment Clause.  See *id*. at 793 (concluding that the activity of the praying parents group during the school year, "when considered in the totality of the circumstances, violated all three prongs of the *Lemon* test.")

### C.  The Christian Assemblies fail the Endorsement Test.

The Christian Assemblies also cannot survive scrutiny under the endorsement test.  See e.g. *Ingebretsen,* 88 F.3d at 280 (statute authorizing prayers at student assemblies "is an unconstitutional endorsement of religion").  The endorsement test applies "'[i]n cases involving state participation in a religious activity.'"  *Borden,* 523 F.3d at 175 (citing *Santa Fe*, 530 U.S. at 308).  Pursuant to this test, the government "unconstitutionally endorses religion whenever it appears to 'take a position on questions of religious belief,' or makes 'adherence to a religion relevant in any way to a person's standing in the political community.'"  *Ingebretsen*, 88 F.3d at 280 (citing *Allegheny,* 492 U.S. at 594).  The "government creates this appearance when it conveys a message that religion is 'favored,' 'preferred,' or 'promoted' over other beliefs."  *Id*.  Put another way, "it is impermissible for the government to 'endorse' religion by conveying a message that religion is preferred over non-religion."  *Beaumont*, 240 F.3d at 479.  The Defendants' policy of sponsoring and facilitating on-campus religious events during the school day, such as the Christian Assemblies, fails the endorsement for reasons similar to its failure under the *Lemon* "effect" prong, as it promotes religion in general and Christianity specifically, making

---

[19] Kristen Cockrell, a teacher at the high school and member of the Church, wrote on the Church's blog: "I told all of my classes on the first day, as I always do, if at anytime [sic] throughout the semester or at any other time they needed me to pray for them, a situation, friend, or anything else, all they had to do was ask . . . As Pinelake began talking about Outlive Your Life and NWR [*i.e.* the School] about "Out-teach like you have ever taught before" that is what my world became. Christ showed me that by outliving, I was out-teaching. I was reaching students in other ways than just by giving them an education. Through the Public Speaking class I teach, *we are able to talk about Christ, in depth, daily*." http://pinelake.org/blog/outlive-out-teach/ (accessed May 7, 2013).

non-Christians students feel like outsiders in their own public schools simply because of their different religious views.[20]

It is well settled that encouraging "or facilitating any prayer clearly fosters and endorses religion over nonreligion, and so runs afoul of the First Amendment." *Holloman*, 370 F.3d at 1288. In *Santa Fe*, the Supreme Court merely "reaffirmed that the Establishment Clause . . . prohibits a school district from taking affirmative steps to create a vehicle for prayer to be delivered at a school function. . . . This principle has been established for more than thirty years." *Chandler v. Siegelman*, 230 F.3d 1313, 1315 (11th Cir. 2000), *cert denied,* 533 U.S. 916 (2001) (citing *Engel*, 370 U.S. 421). When a religious invocation

> occurs at a school-sponsored event at a school-owned facility, the conclusion is inescapable that the religious invocation conveys a message that the school endorses the religious invocation. . . . Furthermore, to persons of any age who do not believe in prayer, religious invocations . . . convey the message that the state endorses religions believing in prayer and denigrates those religions that do not.

*Jager* 862 F.2d at 831-32.[21]

A religious activity is "school-sponsored" under the Establishment Clause if "an objective observer . . . will perceive official school support for such religious [activity]." *Board of Educ. v. Mergens*, 496 U.S. 226, 249-50 (1990). Applying this test, the Court in *Santa Fe* held that a school district violated the Establishment Clause by allowing students to deliver pregame prayers. 530 U.S. at 309-310. The Court reasoned that "an objective . . . student will unquestionably perceive the inevitable pregame prayer as stamped with her school's seal of approval." *Id.* at 308. The Court explained:

> School sponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherents "that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." The delivery of such a message - over the school's public address system, by a speaker representing the student body, under the supervision of school faculty, and pursuant to a school policy that explicitly and implicitly encourages public prayer - is not properly characterized as "private" speech.

*Id.* at 309-310 (internal citations omitted). The Fifth Circuit likewise concluded that "student-selected, student-given, sectarian, proselytizing [prayers and messages at school events] violate both the *Lemon* test and the endorsement test." *Santa* Fe, 168 F.3d at 818.

---

[20] See also *Santa Fe,* 168 F.3d at 818 (citing *Ingebretsen*, 88 F.3d at 280).
[21] Cited with approval in *Ingebretsen*, 864 F. Supp. at 1487-88.

Applying the endorsement test here, the Christian Assemblies clearly amount to "state-sponsored" religious activity and cannot properly be considered "private" speech.   See e.g. *Ingebretsen*, 864 F. Supp. at 1490 (holding that "[s]tudent assemblies . . . are not open forums in public schools"); *Collins,* 644 F.2d at 762-763 (rejecting the school's argument that the "denial of permission to open assemblies with prayer would violate the students' rights to free speech," emphasizing that the assemblies took place on campus, during school hours, and were supervised by faculty); *Herdahl*, 933 F. Supp. at 589 (holding that "even if [a school] established a limited open forum for student speech . . . sectarian prayer broadcast over the public school loudspeaker would still violate the First Amendment" because "it is the act of turning over the 'machinery of the State' to the students in the religious majority to broadcast their religion which violates the Constitution").   See also *Santa Fe*, 168 F.3d at 821 n.11 (distinguishing the after-school student religious clubs at issue in *Mergens*, noting that "the organization was not permitted to deliver a religious message directly to the student body" and emphasizing that the Establishment Clause does not permit "students to present overtly sectarian and proselytizing religious prayers to a group of students clearly assembled at the behest of the government"). [22]   In short, public school assemblies are state-sponsored activity and do not constitute public forums for private speech. The speech delivered at these assemblies is school-endorsed, and therefore unconstitutional as they are religious in nature.

Here, as in *Santa Fe,* there is no evidence that the School has granted the sort of "general access" to students to make "'indiscriminate use' of its government controlled channel of

---

[22] All courts seem to agree that school assemblies meet the state-sponsored activity test and do not constitute public forums for private speech. See e.g., *A.M. v. Taconic Hills Cent. Sch. Dist*., 2013 U.S. App. LEXIS 2440, *9-10 (2d Cir. 2013) ("The Ceremony constituted 'school-sponsored expressive activities'" in which "a reasonable observer would perceive A.M.'s speech as being endorsed by the Middle School," because "the Ceremony was set to occur 'at a school-sponsored assembly, to take place in the school [auditorium].'") (citing *Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 629 (2d Cir. 2005)); *Golden v. Rossford Exempted Vill. Sch. Dist*., 445 F. Supp. 2d 820, 825 (N.D. Ohio 2006) ("Because the assembly was not a forum of any kind, Defendants were entitled to exercise editorial control over [a band]'s potential performance because the audience might likely ascribe the [Christian] band's views to the School."); *St. Johns County*, 632 F. Supp. 2d at 1094-95 (implicitly rejecting notion that school assembly was a public forum in holding that the school violated the Establishment Clause by including a religious song in the assembly).   Cf. *DeNooyer v. Livonia* Pub. Schs., 799 F. Supp. 744, 748-49 (E.D. Mich. 1992), *affirmed,* 12 F.3d 211, 1993 U.S. App. LEXIS 20606 (6th Cir. 1993), *cert. denied,* 511 U.S. 1031 (1994) (rejecting notion that a classroom was a public forum that could be used by a student to show a video of herself singing before her church congregation, explaining, "[t]he fact that Kelly DeNooyer was invited to speak in front of her class . . . does not show that the school opened its doors for indiscriminate public expression;" rather the "classroom was a closed forum during class hours"). Cf. *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 678, 683 (1986) (recognizing a high school assembly as a non-public forum, holding that a student could properly be suspended for delivering a lewd speech, reasoning, "[t]he determination of what manner of speech in the classroom or in *school assembly* is inappropriate properly rests with the school board.") (emphasis added).

communication'" to stage assemblies on other viewpoints during the school day.  *Id.* at 819-20 (internal citations omitted).[23]   The School instead handpicked the speakers and message of the Christian Assemblies, and, in choosing to present this religious message during school hours, engaged in governmental speech forbidden by the Establishment Clause.  See *Herdahl*, 933 F. Supp. at 589 (holding that a school did not create an open forum based on the fact that "the only club that has been provided the opportunity to actually espouse its beliefs over the intercom is the [religious] Club," and that "the evidence clearly shows . . . that [the school] is not maintaining a soapbox for the religious, social or political expressions of members of the student body who want to preach, teach or politicize over the intercom system.").  See also *Santa Fe,* 168 F.3d at 820 ("[i]n no way can [the school] be said to have granted 'general access' to a class speakers at its graduation ceremony. Rather, it has simply concocted a thinly-veiled surrogate process by which a very limited number of speakers . . . will be chosen to deliver prayers.").  The Supreme Court has made clear that such "selective access does not transform government property into a public forum." *Santa Fe*, 530 U.S. at 303.   As such, the School cannot claim that the speech at issue is genuinely private speech protected by the Free Speech Clause

But even assuming *arguendo* that the School created a public forum, the Supreme Court has "never held [that] the mere creation of a public forum shields the government entity from scrutiny under the Establishment Clause." *Id.* at 303, n.13.  There is *no* "exception to the endorsement test for the public forum context." *Id.* Here, the School has "fail[ed] to divorce itself from the religious content" of the student-delivered religious speech and therefore cannot characterize "the individual student as the circuit-breaker in the process." *Id.* at 305.  It is settled law that a student's religious message is unconstitutional when "delivered to a large audience assembled as part of a regularly scheduled, school-sponsored function conducted on school property." *Id.* at 307.  In *Holloman*, the Eleventh Circuit declared that a prayer is "not 'student-initiated,' . . . simply because the initial idea for the prayer was a student's." 370 F.3d at 1287.  The "true test of constitutionality is whether the school encouraged, facilitated, or in any way conducted the prayer." *Id.*  In this case, there is ample evidence that the School encouraged and

---

[23] See also *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 270 (1988) (holding that school-run student newspaper was not designated forum because school officials "did not evince either by policy or practice any intent to open the pages of [newspaper] to indiscriminate use by its student reporters and editors, or by the student body generally"); *Campbell v. St. Tammany Parish Sch. Bd.*, 231 F.3d 937, 941-942 (5th Cir. 2000) ("St. Tammany has not permitted an indiscriminate range of uses. Express permission, almost always in writing, is required before using any of the school facilities. . . . Such a limited set of uses does not create a public forum.").

facilitated the Christian Assemblies by making them part of the school day and by making at least two of them compulsory.  Principal Frazier also used the school e-mail system to promote the assemblies.  Teachers and administrators oversaw the events, telling students to attend and preventing students from leaving.  Even "'genuinely student-initiated speech may constitute state action if the State participates in or supervises the speech.'" *Id.* (citation omitted).  Student religious speech "'must be without oversight, without supervision, subject only to the same reasonable time, place, and manner restrictions as all other student speech in school.'" *Id.* Accordingly, the Christian Assemblies "cannot be considered purely student speech" because they took place on campus, "during school hours," and were organized with the cooperation of the School administration.  *Id.*  An objective observer would unequivocally perceive the message and prayers delivered at the assemblies as being "stamped with [the] school's seal of approval." *Santa Fe*, 530 U.S. at 308.  The Defendants' policy permitting these overtly religious assemblies therefore violates the Establishment Clause.

### D. **The Christian Assemblies fail the Coercion Test.**

Finally, although not a necessary element of an Establishment Clause claim, the Christian Assemblies are unconstitutional because of the coercive pressure involved.  The Supreme Court has made clear that "at a minimum, the [Establishment Clause] guarantees that government may not coerce anyone to support or participate in religion or its exercise." *Lee*, 505 U.S. at 587.  In *Lee*, the Court held that a school's policy of allowing a principal to invite a member of the clergy to give a nonsectarian invocation and benediction at its graduation ceremony placed unconstitutional coercive social pressure on students to participate in a state-directed religious exercise. 505. U.S. at 586.  The Fifth Circuit properly observed that "*Lee* is merely the most recent in a long line of cases carving out of the Establishment Clause what essentially amounts to a *per se* rule prohibiting public-school-related or -initiated religious expression or indoctrination." *Duncanville I,* 994 F.2d at 165 (citing *Edwards*, 482 U.S. at 583-84; *Wallace,* 472 U.S. at 60; *Stone*, 449 U.S. at 42; *Schempp*, 374 U.S. at 252-53; *Engel*, 370 U.S. at 430).  Of course, "an Establishment Clause violation does not depend upon the presence of actual governmental coercion." *Karen B.,* 653 F.2d at 902 (citing *Schempp,* 374 U.S. at 223, *Engel*, 740 U.S. at 430).[24]

---

[24] See *Schempp*, 374 U.S. at 223 ("a violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended."); *Santa Fe*, 168 F.3d at 818 ("we are not required to determine that such public school prayer policies also run afoul of the Coercion Test."); *Carlino*, 57 F. Supp. 2d at 24 ("government endorsement of religion, in the absence of coerced participation, still violates the Establishment Clause.").

Furthermore, the word "coercion" has given a broad meaning by the Supreme Court in this context. This is because "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Lee*, 505 U.S. at 592. In particular, "prayer exercises in public schools carry a particular risk of indirect coercion." *Id.* A school's "supervision and control of a [school event] places public pressure, as well as peer pressure" on students. *Id.* at 593. "This pressure, though subtle and indirect, can be as real as any overt compulsion." *Id.* Objecting students are placed "in the dilemma of participating, with all that implies, or protesting." *Id.* The Court in *Lee* made clear that the "State may not, consistent with the Establishment Clause, place primary and secondary school children in this position." *Id.* The "government may no more use social pressure to enforce orthodoxy than it may use more direct means." *Id*. at 594.

Although *Lee* involved a school graduation, cases "involv[ing] student prayer at a different type of school function" are also "guided by the principles . . . endorsed in *Lee*." *Santa Fe*, 530 U.S. at 301-02. See e.g., *Ingebretsen*, 88 F.3d at 279 (applying *Lee* to religious speech in school assemblies); *Ingebretsen*, 864 F. Supp. at 1488 (same). The Fifth Circuit uses a three-part test in applying *Lee*. *Croft v. Perry*, 624 F.3d 157, 169 (5th Cir. 2010). Under this test, "school-sponsored activity contravenes the First Amendment when '(1) the government directs (2) a formal religious exercise (3) in such a way as to oblige the participation of objectors.'" *Freiler*, 185 F.3d at 343 (citation omitted). As shown below, the Defendants' Christian Assemblies fail this test because the School directed a formal religious exercise, in the form of an assembly containing proselytization and prayer, in a way that obligated the Plaintiff's participation. See *Ingebretsen,* 88 F.3d at 279 (holding that a statute permitting student prayer in school assemblies "is also unconstitutional under the 'coercion test,'" as it would "allow prayers to be given by any person . . . at school functions where attendance is compulsory"); *Ingebretsen,* 864 F. Supp. at 1488 ("permitting [even] nonsectarian, nonproselytizing student-initiated voluntary prayer at compulsory student assemblies" violates *Lee* because if "students are subjected to prayer in a 'captive audience' situation, the state, although not officially delivering the prayer, may be effectively coercing students who do not wish to hear or participate in a prayer to do so").

First, the Christian Assemblies were state-directed, as discussed at length *supra*. Student-delivered religious messages "authorized by a government policy [to] take place on government property at government sponsored school-related events" become government-affiliated religious

messages.  *Santa Fe*, 530 U.S. at 301-02.   There is no question that the junior and senior assemblies were state-directed, as attendance was mandatory for both.  See *Ingebretsen,* 864 F. Supp. at 1488.  The freshman and sophomore assemblies were also state-directed; they occurred on-campus, during school hours, and were organized and sponsored by the School.  In any event, making attendance optional does nothing to mitigate school sponsorship of the religious message. *Id.*[25] See also *Santa Fe,* 530 U.S. at 309-10; *Collins*, 644 F. 2d at 761 (holding that a school's granting of "permission for students to conduct prayers [to open assemblies] cannot be saved from constitutional attack merely because attendance at school assemblies is voluntary").[26]   As in *Lee*, all four assemblies were "state-directed" in light of the "school district's supervision and control" of the event.  505 U.S. at 593.  The School retained control over each assembly by choosing the speaker, approving the message and carving out instructional time during the school day for the event to take place.  Accordingly, the first element of the coercion test is satisfied.

Second, the Christian Assemblies constitute a formal "religious exercise" within the meaning of *Lee.*  They consist almost entirely of Christian proselytization and prayer.  Prayer, of course, is a "quintessential religious practice."  *Karen B.*, 653 F.2d at 901.  Proselytization (*i.e.* an attempt to convince the listener to adopt the speaker's religious views) is also clearly religious and, if possible, even more coercive than prayer, as it is targeted at the listener.  See e.g. *Lassonde*, 320 F.3d at 984 ("permitting a proselytizing speech at a public school's graduation ceremony would amount to coerced participation in a religious practice").   See also *Santa Fe*, 168 F.3d at 818 ("sectarian and proselytizing prayers are by their very nature designed to promote a particular religious viewpoint" and are therefore a "'formal religious exercise'").[27]   That the School might "permit" rather than "require" the assemblies to occur is irrelevant for purposes of finding a

_____

[25]  The court's decision in *Ingebretsen* did not hinge on the fact of mandatory attendance, noting: "Even a rule that would permit students to absent themselves from an assembly they find offensive, even a noncompulsory one, would not cure the Establishment Clause problem."  864 F. Supp. at 1489 (citing *Lee*; *Schempp*, 374 U.S. at 226; *Engel*, 370 U.S. at 430).  The court reasoned that "these assemblies serve an instructional and educational function. Indeed, these assemblies are nothing more than extensions of the classrooms.  It stands to reason that if students are prohibited from praying in the classrooms, allowing them to do so in assemblies of an instructional nature likewise fails all three prongs of the *Lemon* test." *Id.*

[26]  See also *St. Johns County*, 632 F. Supp. 2d at 1096 ("Even if it is established that attendance at the Assembly was voluntary, 'the argument that option of not attending the [Assembly] excuses any inducement or coercion in the [Assembly] itself… lacks all persuasion.' *Weisman*, 505 U.S. at 595.") (alterations in original); *Lundberg,* 731 F. Supp. at 344 ("The voluntariness of attendance at the ceremony does not decrease the concern that prayer at the ceremony might still appear to have the stamp of school approval."). See also *Holloman*, 370 F.3d at 1287-1288; *Jager,* 862 F.2d at 832; *Mangold,* 438 F.2d at 1195-96; *Skarin,* 204 F. Supp. 2d at 1198.

[27]  See also *Cole*, 228 F.3d at 1104 (upholding school district's refusal to allow valedictorian to give a "sectarian, proselytizing speech" at graduation ceremonies); *Workman*, 2010 U.S. Dist. LEXIS 42813, *16-17 ("As in *Lee*, the prayer is a formal religious exercise at a public school graduation").

BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

"formal religious exercise."  See *id.* at 818, n.10 ("a religious practice derives its religious nature from its content and . . . not from whether it is permitted or required by the school.").

Third, the final element of the coercion test is met because the Christian Assemblies, in the context of the social environment of a high school, "oblige the participation of objectors" in the broad sense of the bringing to bear of the sort of coercive social pressure described in *Lee*. *Freiler*, 185 F.3d at 343 (citation omitted).  The junior and senior assemblies were clearly compulsory, as students had no choice but to attend.  Although the freshman and sophomore assemblies may (or may not) have been technically "optional," they were in fact obligatory within the meaning of *Lee*.[28]  In interpreting *Lee*, courts have focused on the impressionability of students in secondary schools and the pressure they feel from teachers, administrators, and peers.  See e.g. *Edwards*, 482 U.S. at 584; *Lee*, 505 U.S. at 593.[29]  In *Lee* itself, the Court determined that a graduation ceremony, which was technically voluntary, was not voluntary in the true sense of the meaning of the word in this context:

> To say that a student must remain apart from the ceremony . . . is to risk compelling conformity in an environment analogous to the classroom setting, where we have said the risk of compulsion is especially high . . . the fact that attendance at the graduation ceremonies is voluntary in a legal sense does not save the religious exercise.

*Id.* at 595-96.  Like *Lee,* the religious exercises "in this case are especially improper because the State has in every practical sense compelled attendance and participation." *Id.* at 598. All four assemblies took place on campus during class hours and were supervised by faculty and administrators. See *Ingebretsen*, 864 F. Supp. at 1489 ("attendance at assemblies is compulsory, since the majority of the assemblies take place during instructional hours" and are thus "nothing more than extensions of the classrooms").  If, as the Supreme Court held in *Santa Fe*, an after school football game is not truly a voluntary event within the meaning of *Lee*, these Christian Assemblies surely are not voluntary as well. 530 U.S. at 312 ("Even if . . . [a] student's decision to attend a home football game [is] purely voluntary, . . . the delivery of a pregame prayer has the improper effect of coercing those present to participate in an act of religious worship").  The

---

[28] See 505 U.S. at 586 ("Even for those students who object to the religious exercise, their attendance and participation in the state-sponsored religious activity are in a fair and real sense obligatory, though the school district does not require attendance as a condition for receipt of the diploma.").

[29] Similarly, the Court has described a policy that permitted parents to excuse their children from sitting in class while other students read Bible passages as one that did *not* "mitigate the *obligatory* nature of the ceremony."  *Schempp*, 374 U.S. at 288-293.

BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Defendants cannot pressure or encourage students, either subtly or overtly, to attend religious assemblies.  Even those who opt out are "likely to feel ostracized and stigmatized."  *Herdahl*, 887 F. Supp. at 910-11.  See also *Collins*, 644 F.2d at 762 (students "must either listen to a prayer chosen by a select group of students or forego the opportunity to attend a major school function. It is difficult to conceive how this choice would not coerce a student wishing to be part of the social mainstream").  Accordingly, all three elements of the coercion test are met here, rendering the Defendants' Christian Assemblies unconstitutional.

In view of the above, the Plaintiff is highly likely to prevail on the merits of her case because she can establish that the Defendants' policy of permitting and sponsoring Christian Assemblies violates the Establishment Clause in multiple ways.

## IV.   REQUEST FOR SECURITY BOND WAIVER

The Plaintiff hereby requests that the Court waive the security bond requirement of FRCP 65 (c) for this public-interest litigation[30] in light of the fact that the Defendants will suffer no harm as a result of the issuance an injunction.[31]

## V.   CONCLUSION

A preliminary injunction is necessary to prevent the Defendants' policy and practice of staging unconstitutional religious assemblies, such as the Christian Assemblies, at schools in the School District.  Because the Plaintiff has shown (i) that she will suffer irreparable injury if the injunction is not issued, because her First Amendment rights are at stake;  (ii) that the threatened injury to her outweighs any harm the injunction might cause to the Defendants, because the Defendants are not harmed by an order requiring them to meet their preexisting duty to comply with the Constitution; (iii) that the injunction will serve the public interest because it vindicates constitutional rights; and (iv) a likelihood of success on the merits, we ask that this Court issue the requested injunctive relief.

---

[30] See *Advocacy Ctr. for the Elderly & Disabled v. La. Dep't of Health & Hosps.*, 731 F. Supp. 2d 603, 626-627 (E.D. La. 2010) ("'[w]aiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right.'").

[31] *Wexler v. City of New Orleans*, 2003 U.S. Dist. LEXIS 6561, *12 (E.D. La., 2003) ("the Court hereby waives the bond requirement pursuant to Fed. R. Civ. P. because the City has made no showing that it will suffer any monetary injury"); *Booth v. University Interscholastic League*, 1990 U.S. Dist. LEXIS 20835 (W.D. Tex., 1990).

Respectfully submitted,

_/s/Dianne Herman Ellis_____
Dianne Herman Ellis

**Attorneys for the Plaintiff:**

William Burgess
American Humanist Association
1777 T Street, N.W.
Washington, D.C. 20009
Telephone: (202) 238-9088
bburgess@americanhumanist.org
DC Bar No. 473101

Monica Miller
American Humanist Assoc.
1777 T Street, N.W.
Washington, D.C. 20009
Telephone: (202) 238-9088
mmiller@americanhumanist.org
CA Bar No. 288343

Dianne Herman Ellis
Silin & Ellis
1161 Robinson Avenue
Ocean Springs, Mississippi
39564
Telephone: (228) 447-4118
diannernjd@aol.com
MS Bar No. 102893

Rita Nahlik Silin
Silin & Ellis
1161 Robinson Avenue
Ocean Springs, Mississippi
39564
Telephone: (228) 447-4118
rsilin@gmail.com
MS Bar No. 102662

BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION