# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| **M.B.**, a minor by and through her next friend, Kanwar Singh Bedi | Case No. 3:13-cv-00241-DPJ-FKB |
| *Plaintiff,* | |
| v. | |
| **Rankin County School District**, **and** **Charles Frazier**, Individually and in his Official Capacity as Principal of Northwest Rankin High School, | |
| *Defendants*. | |

## PLAINTIFF'S REBUTTAL TO HER SUPPLEMENTAL MEMORANDUM AND EVIDENCE IN SUPPORT OF HER MOTION FOR CONTEMPT AND PLAINTIFF'S RESPONSE TO DEFENDANTS' EVIDENTIARY OBJECTIONS

## INDEX OF EXHIBITS (PREVIOUSLY FILED IN THE SUPPLEMENT)

Plaintiff's Responses to Defendants' Interrogatories and Request for Production......................Exhibit 1

Defendants' Responses to Plaintiff's Interrogatories .................................................................Exhibit 2

Defendants' Responses to Plaintiff's Request for Production ....................................................Exhibit 3

Defendants' Responses to Plaintiff's Request for Admission ....................................................Exhibit 4

Tammy Bedi Records Request (10-19-14) ..................................................................................Exhibit 5

Defendants' Response to Bedi Records Request (11-3-14)..........................................................Exhibit 6

ACT Awards Ceremony Transcriptions .....................................................................................Exhibit 7

2014 ACT Awards Ceremony Screenshots of Video Footage ...................................................Exhibit 8

Northwest Rankin Elementary Bible Distribution Email ...........................................................Exhibit 9

AHA Letter to Defendants re: Bible Distribution (10-13-14) ..................................................Exhibit 10

AU Letter to Defendants re: Bible Distribution (11-7-08) .......................................................Exhibit 11

## INDEX OF EXHIBITS (NEW)

Transcript of M.B. Deposition ................................................................................................Exhibit 12

Monica Lynn Miller Declaration .............................................................................................Exhibit 13

Ian Smith Declaration ..............................................................................................................Exhibit 14

Dianne Herman Ellis Declaration ............................................................................................Exhibit 15

Clarion-Ledger Article.............................................................................................................Exhibit 16

## I.   INTRODUCTION

Plaintiff appreciates the Court's sensitivity to the time constraints attendant to her Motion for Contempt, as the Court indicated during the status hearing on January 14, 2015, that it was hoping to make a ruling before the upcoming ACT Awards Ceremony. Defendants, for the first time in this proceeding, stated in passing, likely in an attempt to thwart an imminent ruling, that they will no longer include prayer in ACT Awards Ceremonies and that Dr. Weathersby will go so far as to "stand at the door" to ensure prayers are not included. (It bears mentioning that no such statement or guarantee is present in any of Defendants' memoranda or exhibits filed after the January 14 status hearing). Defendants, in their recent memoranda, even admit that such prayers are unconstitutional. Thus, the Court must question why Dr. Weathersby, who has presided over each and every ACT Award Ceremony for the past five years, and who has personally participated in such prayers, and Mr. Frazier, who has also been an active participant in the prayers, did nothing to prevent or disclaim the prayer offered at Plaintiff M.B.'s ceremony.

Defendants knew M.B. would be attending the 2014 ACT Awards Ceremony. They also knew in advance that a prayer would be delivered at the ceremony, as a prayer has been included in every ceremony since at least 2011, the Establishment Clause notwithstanding. Superintendent Weathersby and Principal Frazier presided over the event, as they have in the past, and approved of the program, which expressly stated that a prayer would be delivered by Rev. Rob Gill. Worse, Defendants led and participated in the prayer at the 2014 Ceremony.

Defendants also knew full well that they were bound by an Order of this Court, and by the Establishment Clause, both of which prohibit them from including a prayer, especially a prayer by a Christian reverend, *e.g. Lee v. Weisman*, 505 U.S. 577 (1992); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000), at a school-sponsored event. In the Agreed Judgment, Defendants expressly admitted that they violated Plaintiff M.B.'s rights under the Establishment Clause by subjecting her to an assembly in which Christian prayers, which were even student-led and possibly student-initiated, were delivered. With this admission, and with the injunctive terms of the Agreed Judgment requiring Defendants to comply with the Establishment Clause and

specifically prohibiting them from endorsing religion or coercing students to participate in religious activity, Plaintiff M.B. felt confident that her First Amendment rights would be respected for the few months remaining as a student at NRHS.

A mere five months later, however, Defendants subjected M.B. to yet another and far more flagrant violation of the Establishment Clause. It is difficult to fathom how a person in M.B.'s shoes would not feel betrayed, offended, shocked, confused and embarrassed by such actions of the Defendants. (M.B. Depo. p.13, ll. 25; p.14 ll.1-10, attached as Exhibit 12). Plaintiff, in good faith, agreed to drop her complaint under the assumption Defendants would respect her desire to be free from state-sponsored religion and coercion. At an event where she was hoping to be honored for her academic accomplishments, Plaintiff M.B. left feeling dishonored and disrespected – and rightfully so. She felt personally affronted by Defendants' actions, as she knew that they knew she was going to be there (*Id.* at p. 6, ll. 7-11) and that she did not want to be subjected to state-sponsored religion.

While no remedy can perfectly restore the loss of Plaintiff's First Amendment freedoms, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); *Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 166 (5th Cir. 1993), they can at least partially be vindicated by an award of compensatory damages and by coercive contempt fines designed to prevent Defendants from violating the Establishment Clause in the future.

For "the government to coerce someone to participate in religious activities strikes at the core of the Establishment Clause of the First Amendment." *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007). Over fifty years ago, the Supreme Court ruled that "one of the greatest dangers to the freedom of the individual to worship in his own way lay in the Government's placing its official stamp of approval upon one particular kind of prayer or one particular form of religious services." *Engel v. Vitale*, 370 U.S. 421, 429 (1962). It has more recently made clear that "there are heightened concerns with protecting freedom of conscience from [even] subtle coercive pressure in the elementary and secondary public schools." *Lee v. Weisman*, 505 U.S. 577, 592

2

(1992). It is worth noting that at no point has M.B. identified as an atheist; she does not consider herself to be anti-religious or anti-Christian (she was raised by her Methodist mother and Sikh father). Rather, M.B. a sophisticated and intelligent young adult wishes to develop her own beliefs on religion, unobstructed by governmental coercion, pressure, or sponsorship. M.B., who participated in Model United Nations at NRHS, and who is now in the three-year Politics, Policy, and Law program at American University, respects the Constitution and separation and church and state. This should, if anything, earn the respect of her teachers and administrators.

To excuse Defendants from their willful and reckless disregard of Plaintiff's First Amendment rights would be a miscarriage of justice. Courts "do not sit for the idle ceremony of making orders and pronouncing judgments, the enforcement of which may be flouted, obstructed, and violated with impunity, with no power in the tribunal to punish the offender." *Waffenschmidt v. Mackay*, 763 F.2d 711, 716 (5th Cir. 1985).

## II. DEFENDANTS MUST BE HELD IN CONTEMPT FOR VIOLATING THE AGREED JUDGMENT AND ESTABLISHMENT CLAUSE.

By including a Christian prayer by a Christian reverend at a school-sponsored event, Defendants unequivocally violated the Establishment Clause, and thus, the Agreed Judgment. The key facts are undisputed: the ACT Awards Ceremony was a school-sponsored event; the superintendent and high school principals, including Principal Frazier, presided over the event; a Christian prayer was delivered by a Christian reverend; the superintendent and principals led and participated in the prayer; and students were asked to participate in said prayer. Notably, "[t]he School District *does not contest* that the invocation at the April 17, 2014 ACT Awards Ceremony falls within conduct which the United States Supreme Court found violative of the First Amendment in *Lee v. Wiesman*, 505 U.S. 577 (1992)." (Dkt. 94 p.4). As such, Defendants admit they violated the Establishment Clause under the *Lee* coercion test, and thus, the Agreed Judgment, which prohibits the School District an its agents from "obligat[ing] or coerc[ing] any person into participation in a religious activity." (Dkts. 63 & 63-1 at Exh. A).

Because Defendants violated the Agreed Judgment, they must be held in civil contempt,

*even if* their actions were unintentional, *infra*.

    A.   <u>Defendants violated the Agreed Judgment and the Establishment Clause, regardless of whether the 2014 ACT Awards Ceremony was "mandatory."</u>

Defendants first appear to argue that because the ceremony was not "mandatory," their actions in including a prayer were not violative of the Establishment Clause or Agreed Judgment. (Dkt. 94, p.2-3). Yet this position directly conflicts with their admission that the prayer violated the Establishment Clause under *Lee.* (*Id.* at p.4). Because Defendants' concede that they violated the Establishment Clause, the Court must find them in contempt.

Of course, even without their explicit admission, Defendants' argument regarding the voluntary nature of the event must be rejected. For one thing, the Agreed Judgment is not limited to actions that coerce students in the context of mandatory events; it very clearly prohibits them from sponsoring or endorsing religion, independent of any coercion. The Agreed Judgment contains the following term: "school activities conducted during instructional hours should neither advance, endorse or inhibit any religion." (¶7(a); Exh. A). Defendants have admitted:

> The Religion Policy explicitly states that during instructional hours the School District will not allow activities that "advance, endorse or inhibit any religion," [and] that school activities should be primarily for secular purposes . . .

(Dkt. 20, p.4). Defendants called it "a clear and unambiguous policy[.]" (*Id.* at 4-5). *See also Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806, 818 (5th Cir. 1999), *aff'd*, 530 U.S. 290 (2000) ("we are not required to determine that such public school prayer policies also run afoul of the Coercion Test."); *Carlino v. Gloucester City High Sch.*, 57 F. Supp. 2d 1, 24 (D.N.J. 1999), *aff'd* 44 Fed. Appx. 599 (3rd Cir. 2002) ("government endorsement of religion, in the absence of coerced participation, still violates the Establishment Clause."). There is no question that the Awards Ceremony prayer endorsed and advanced religion in violation of the Agreed Judgment and Establishment Clause. Whenever a prayer "occurs at a school-sponsored event . . . the conclusion is inescapable that the religious invocation conveys a message that the school endorses" it. *Jager v. Douglas Cnty. Sch. Dist.*, 862 F.2d 824, 831-32 (11th Cir. 1989).

Moreover, in *Lee*, the Court held that a public school's inclusion of a nonsectarian prayer

in a graduation ceremony was unconstitutionally coercive even though the event was *technically voluntary* and students were not required to participate in the prayer. 505 U.S. at 586; 593. The same was true of the ACT Awards Ceremony. *See* M.B. Depo. p. 8, ll. 24-25 ("It was highly expected of you to attend"); p.9, ll.3-4 ("if you showed up for school, you were expected to go."). And in *Santa Fe*, 530 U.S. at 307, the Court held that student-led prayer at football games, which were *completely voluntary*, violated the Establishment Clause under the second prong of *Lemon* because the prayer was "delivered to a large audience assembled as part of a regularly scheduled, school-sponsored function conducted on school property."[1]

B.  The School District is liable in contempt for the violations.

Defendants' second argument is as troubling as it is meritless. They claim that even if the 2014 ACT Awards Ceremony was unconstitutional, they should be excused from any liability arising therefrom because "a lay person is not equipped to undertake the study and interpretation that a lawyer brings to a question of law. (Dkt. 94 p.3). As Defendants readily concede, "good faith" is not a defense to civil contempt, and thus, even if they had no idea that including a prayer by a Christian reverend at a school-sponsored event would violate the Establishment Clause, they would still be in civil contempt. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 76 (1st Cir. 2002); *Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir. 1985).

The "sole question is whether a party complied with the district court's order." *Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983). *See also McLean v. Cent. States, Se. & Sw. Areas Pension Fund*, 762 F.2d 1204, 1210 (4th Cir. 1985). A "person fails to act as ordered by the court" and is thus liable in civil contempt "when he fails to take 'all the reasonable steps within [his] power to insure compliance with the [court's] order.'" *Cuviello v. City of Stockton*, 2009 U.S. Dist. LEXIS 4896, *21-22 (E.D. Cal. 2009) (citing *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 406 (9th Cir. 1976)). *See United States v. Ryan*, 402 U.S. 530, 534 (1971). Thus,

---

[1] It is well-settled law that "an Establishment Clause violation does not depend upon the presence of actual governmental coercion." *Karen B. v. Treen*, 653 F.2d 897, 902 (5th Cir. 1981), *aff'd*, 455 U.S. 913 (1982). *See Sch. Dist. Abington v. Schempp*, 374 U.S. 203, 223 (1963); *Engel*, 370 U.S. at 430.

"unless a respondent introduces some evidence to suggest that he has made *all reasonable efforts* to comply," he "will not rebut the prima facie showing of non-compliance." *United States v. Hayes*, 722 F.2d 723, 725 (11th Cir. 1984) (emphasis added). *See Williamson v. Recovery Ltd. P'ship*, 467 Fed. Appx. 382, 402 (6th Cir. 2012) (parties' "failure to take meaningful steps to ensure compliance with the Consent Order solidly underpins the contempt judgment").

The record is barren of any facts tending to show that Defendants took steps to comply with the Agreed Judgment. To the contrary, the evidence shows that Defendants, including Superintendent Weathersby and Principal Frazier, actively endorsed and promoted the prayer at the 2014 ACT Awards Ceremony. The School District included the prayer on the program and a school official asked the students to stand for the prayer. School District officials including Principal Frazier personally led and participated in the prayer. Thus, the School District and Principal Frazier are in contempt of the Agreed Judgment.

Once "a complainant makes a showing that respondent has disobeyed a decree" he "is entitled as of right to an order in civil contempt imposing a compensatory fine." *Parker v. United States*, 153 F.2d 66, 70 (1st Cir. 1946). The "Court is *not free* to exercise its discretion and withhold an order awarding compensatory damages." *In re Grand Jury Subpoena*, 690 F. Supp. 1451, 1453 (D. Md. 1988) (emphasis in original).

Defendants' blame-shifting approach is equally problematic, both as a matter of law and fact. They contend that "[t]he person who organized the 2014 ACT Awards Ceremony did not understand that an invocation might violate the Court's November 22, 2013 Agreed Judgment." (Dkt. 94, p. 3-4). Even taking this as true, it is irrelevant. The School District has a responsibility to ensure that its programs comply with the Establishment Clause, *especially* because they are under a binding Court decree to do so. "As an employee of the School District," Robin Haney's actions "can be imputed to the School District." *Borden v. Sch. Dist.*, 523 F.3d 153, 177, n.20 (3d Cir. 2008). *See also Steele v. Van Buren Public School Dist.*, 845 F.2d 1492, 1495 (8th Cir. 1988) ("Based on the Board's failure to act and Mitchell's tacit approval of Jones' conduct, the . . . [school] district had a custom or policy allowing prayer in school."). A "school district has a

6

constitutional obligation to ensure that 'subsidized teachers do not inculcate religion.'" *Doe v. Sch. Bd. for Santa Rosa County*, 264 F.R.D. 670, 685 (N.D. Fla. 2010) (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 619 (1971)). School Districts must not permit any "of its teachers' activities [to] give[] the impression that the school endorses religion." *Marchi v. Board of Coop. Educ. Servs.*, 173 F.3d 469, 477 (2d Cir. 1999). It is simply no defense to claim that the school official primarily responsible for organizing the event had no knowledge that the prayer would violate the Establishment Clause; especially where, as here, good faith is irrelevant.

Nevertheless, the evidence shows that Defendants (including Superintendent Weathersby, the final policymaking official for the School District, and Principal Frazier) did have knowledge that a prayer would be delivered at the ceremony and did absolutely nothing to stop it. That is more than is required for civil contempt. As noted previously and as noted below, since at least 2011, Defendants have been including Christian prayers, delivered by Christian reverends, at their ACT Awards Ceremonies. Principal Frazier and Superintendent Weathersby have presided over these events and personally participated in the prayers.

Beyond the fact that the School District has had a longstanding practice of including prayers in their ACT Ceremonies, against well-settled Establishment Clause law, the evidence shows that Defendants more likely than not received copies of the official 2014 program, prior to the ceremony, which expressly listed an "invocation" by Rev. Gill. (Exh. 3 RCSD-1030).[2] At no point did Weathersby, Frazier, Mr. Harrell or any school official in receipt of Ms. Haney's numerous emails regarding the ceremony inform her to eliminate the prayer from the program.

Even assuming, *arguedo,* that Defendants did not have actual knowledge that a prayer would be delivered *beforehand* (which is belied by the facts on the record), neither Weathersby nor Frazier did anything to stop the prayer from being delivered *at the ceremony*. The School

---

[2] A copy of the program was available on March 4, 2014 (Exh. 3; RCSD-1085). Moreover, as early as February 2, Robin Haney sent an email to the school officials, including Weathersby and principals, with the subject line: "ACT Ceremony." (*Id.* at 1119). In the email, she asked everyone to save the date for the ceremony. (*Id.*). On March 17, Ms. Haney mentioned in that she would be distributing a copy of the program to school officials "for you to verify in a few days." (*Id.* at 1082). (*See also* 1060; 1063; 1065; 1081-82). A copy of the program was available to view around April 11. (*Id.* at 1046-48).

District also did nothing to disclaim or apologize for the prayer after it was delivered. Much to the contrary, both Superintendent Weathersby and Principal Frazier *actively endorsed the prayer by personally participating in it*. (Dkt. 64-2, M.B. Decl. ¶¶68-69); (M.B. Depo p.17, ll.20-22; p.18, ll.7-10). Worse, at the close of the ceremony, Dr. Weathersby thanked Rev. Gill for his prayer, thus lending further unconstitutional endorsement and imprimatur over the prayer. (Exh. 3 at RCSD-1026-27). The above facts are more than sufficient to hold the School District liable.

In *Milwaukee Deputy Sheriffs' Ass'n v. Clarke*, 588 F.3d 523, 524-26 (7th Cir. 2009), for instance, the Seventh Circuit held that a county was liable under *Monell* for the actions of the county sheriff in inviting a religious group to speak at the sheriff's department leadership conference and related gatherings in violation of the Establishment Clause. The court deemed it particularly relevant that the sheriff "took no steps to disentangle himself or the Department from any of the religious messages." *Id.* at 528-29 (citing *Santa Fe*, 530 U.S. at 306). *See also Carlino*, 57 F. Supp. 2d at 24  ("In this case, school officials made no effort to disassociate themselves from the Baccalaureate Service.").

The "Establishment Clause applies not only to state statutes, but also to the acts and decisions of individual government actors as well." *Rich v. City of Jacksonville*, 2010 U.S. Dist. LEXIS 143973, *42 (D. Fla. 2010) (citations omitted). Where "a government official makes a decision, 'this is a choice attributable to the State.'" *Id.* (citing *Lee*, 505 U.S. at 587). For § 1983 purposes, municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), "may be pronounced or tacit and reflected in either action or inaction." *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011). *See Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). A *Monell* "policy is a decision that is officially adopted by the municipality, *or created by an official of such rank* that he or she could be said to be acting on behalf of the municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (emphasis added). Likewise, "[i]f a higher official has the power to overrule a decision but as a practical matter never does so, the decision-maker may represent the effective final authority on the question." *Bowen v. Watkins*, 669 F.2d 979, 989 (5th Cir. 1982).

Defendants admit that it has been their policy to include prayer in the ACT Awards Ceremonies and they have offered no evidence showing that they took any steps to change this policy for 2014. Indeed, the school official responsible for the ceremony testifies: "It was my responsibility to organize the 2014 ACT Awards Ceremony. I . . . followed the **_procedure that had been utilized in prior years_**, _including commencement of the ceremony with an_ **_invocation_**." (Dkt. 94-2 Exh. 2 ¶3) (emphasis added). Defendants therefore agree this official had final policy-making authority over the ceremony, sufficient to hold the School District liable for her decision.

A municipality may be liable for "a single decision" of a policymaking official. _Pembaur v. City of Cincinnati_, 475 U.S. 469, 480 (1986). A policy "may also be established by evidence of knowledge and acquiescence." _Mulholland v. Government Cnty. of Berks, Pa._, 706 F.3d 227, 237 (3d Cir. 2013). _See City of St. Louis v. Praprotnik_, 485 U.S. 112 (1988); _Hobart v. City of Stafford_, 916 F. Supp. 2d 783, 794 (S.D. Tex. 2013) (_Praprotnik_ "announced an independent theory of municipal liability premised on ratification."). A municipality may even be held responsible where the policymakers "approve a subordinate's decision and the basis for it." _Praprotnik_, 485 U.S. at 127; _Pembaur_, 475 U.S. at 483-84; _Cornfield v. Consolidated High Sch. Dist. No. 230_, 991 F.2d 1316, 1326 (7th Cir. 1993) ("the failure to make a policy itself may be actionable . . . although lacking formal approval"); _Cook v. Miami_, 464 F. Supp. 737, 739 (S.D. Fla. 1979). "[S]upervisory officials . . . may be liable when their own action or inaction, including a failure to supervise . . . is a proximate cause of the constitutional violation." _Bowen_, 669 F.2d at 988. _See also Church v. City of Huntsville_, 30 F.3d 1332, 1345 (11th Cir. 1994); _Thomas v. City of Chattanooga_, 398 F.3d 426, 429 (6th Cir. 2005).

In this case, _Monell_ liability can attach to the School District on numerous grounds, including but not limited to: (1) the School District has a longstanding policy, practice and custom of including prayer in its ACT Awards Ceremonies and continued such policies through the 2014 Ceremony; (2) Robin Haney was given final policymaking authority over the ACT Awards Ceremony; (3) the Superintendent, a final policymaking official, permitted the prayer to be delivered at the 2014 Ceremony; (4) the Superintendent and School District principals,

including Frazier, actively endorsed the prayer by participating in it; (5) the School District ratified Robin Hanely's actions; and/or (6) the School District failed to supervise the ACT Awards Ceremony. In some cases, "the courts have viewed a single abuse as so flagrant that it gives rise to an inference that the supervisory official must have breached his duty of proper supervision." *Bowen*, 669 F.2d at 989 (citations omitted). In the case at bar, the School District and its officials not only ratified the ACT Award Ceremony prayer but actively endorsed it.

C. Principal Frazier is liable in contempt for his own violations.

Principal Frazier is personally liable in contempt insofar as he is bound by the Agreed Judgment and personally violated it by permitting the prayer to be delivered at the 2014 ACT Awards Ceremony and by participating in and therefore endorsing the prayer, in violation of the Establishment Clause. (M.B. Decl. ¶¶68-69); (M.B. Depo. p.17, ll.20-22; p.18, ll.7-10). Principal Frazier, as a school official and as a participant and overseer of the 2014 Ceremony, had an independent duty to ensure that his own actions were in compliance with the Agreed Judgment.

Where, as here, a teacher leads or participates in prayer with students, the prayers are school-sponsored and thus prohibited by the Establishment Clause. *Karen B.*, 653 F.2d 897 (5th Cir. 1981); *Borden*, 523 F.3d at 174 (coach silently bowing head and kneeling while team prayed violated Establishment Clause); *Holloman v. Harland,* 370 F.3d 1252, 1285 (11th Cir. 2004) (teacher's practice of initiating silent prayer with her students with "let us pray" violated Establishment Clause); *Doe v. Duncanville Indep. Sch. Dist.*, 70 F.3d 402 (5th Cir. 1995); *Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 163 (5th Cir. 1993) (school officials' supervision of student-initiated and student-led prayers preceding basketball games violated Establishment Clause); *Steele v. Van Buren Public Sch. Dist.*, 845 F.2d 1492, 1493 (8th Cir. 1988) (permitting teachers to conduct prayer and religious activity at school functions unconstitutional); *Carlino*, 57 F. Supp. 2d 1 (principal's involvement with a baccalaureate service held unconstitutional; principal was not entitled to qualified immunity); *Sease v. Sch. Dist.*, 811 F. Supp. 183, 192 (E.D. Pa. 1993) ("Clearly, a school employee's participation in, or sponsorship of, a public school gospel choir during school hours would be a violation of the Establishment Clause."). In

10

*Holloman*, the Eleventh Circuit held that a teacher was not entitled to qualified immunity for participating in prayers with students, explaining, "[b]y now *it should go without saying* that it is unconstitutional for a teacher or administrator (or someone acting at their behest) to lead students aloud in voluntary prayer." 370 F.3d at 1286 (emphasis added, citing *Engel* and *Schempp*).[3]

In applying the first prong of *Lemon*, the courts have made clear that because "prayer is 'a primary religious activity in itself,'" a "teacher or administrator's intent to facilitate or encourage prayer in a public school is *per se* an unconstitutional intent to further a religious goal." *Id.* at 1285. *See also Jager*, 862 F.2d at 830 (where school officials participate in an "intrinsically religious practice" such as prayer, even if student-led, it "cannot meet the secular purpose prong."). Not surprisingly, numerous courts have also held that the second prong of *Lemon* is violated when teachers participate in prayer with students. *See Holloman*, 370 F.3d at 1286-87; *Borden*, 523 F.3d at 176-77 (coach "was endorsing religion" when he silently kneeled and bowed head during prayer with students); *Duncanville*, 70 F.3d at 405-06 (coach's participation in prayer was "an unconstitutional endorsement."); *Karen B.*, 653 F.2d at 899.

As in the above cases, Principal Frazier's involvement in prayer "as a participant, an organizer, and a leader" would unquestionably "lead a reasonable observer to conclude that he was endorsing religion." *Borden*, 523 F.3d at 176. As such, he is personally liable in contempt.

## III.   COMPENSATORY *AND* COERCIVE CONTEMPT FINES ARE WARRANTED.

Defendants admit that they violated Plaintiff's rights under the Establishment Clause in connection with the 2014 Act Awards Ceremony. (Dkt. 94 p.4). Defendants also seem to agree that at a minimum, Plaintiff should be awarded compensatory damages to vindicate this loss of her First Amendment freedoms. (*Id.*) ("If the Court sanctions the School District, that sanction

---

[3] *See also Doe v. Wilson Cty. Sch. System*, 564 F. Supp. 2d 766 (M.D. Tenn. 2008) (holding that principal and teacher who bowed their heads during a nonschool sponsored prayer event and wore 'I Prayed' stickers during instructional time violated Establishment Clause); *Daugherty v. Vanguard Charter Sch. Academy*, 116 F. Supp. 2d 897, 910 (W.D. Mich. 2000) ("The presence of teachers and elementary students together, for prayer, on school premises, albeit during non-instructional hours, is a matter of heightened concern."); *Quappe v. Endry*, 772 F. Supp. 1004 (S.D. Ohio 1991), *aff'd*, 979 F.2d 851 (6th Cir. 1992); *Breen v. Runkel*, 614 F. Supp. 355 (W.D. Mich. 1985) (teachers praying and reading Bible in classrooms unconstitutional).

should not be punitive but compensatory in accordance with any injury to the Plaintiff."). However, Plaintiff has made more than an adequate showing for coercive contempt fines, in addition to compensatory fines, based on Defendants' long history of violating the Establishment Clause and their ongoing disregard of the Establishment Clause and Agreed Judgment.

The sole purpose of the $20,000 fine is to "secure future compliance" with the Agreed Judgment, therefore rendering it civil. *United States v. Puente*, 524 Fed. Appx. 119, 122 (5th Cir. 2013). *See also Martin's Herend Imports v. Diamond & Gem Trading USA*, 112 F.3d 1296, 1307 (5th Cir. 1997); *In re Prewitt*, 280 F. Supp. 2d 548, 560 (N.D. Miss. 2003) (citation omitted). It is completely avoidable if Defendants comply with the order. *See United States v. McMillan*, 53 F. Supp. 2d 895, 908 (S.D. Miss. 1999) ("this court imposes on Charles Roy McMillan a fine of $1,000.00 as an appropriate and coercive measure"). Coercive prospective fines are necessary in this case, as they "are a strong inducement toward compliance." *Florida Steel Corp. v. NLRB*, 648 F.2d 233, 240 (5th Cir. 1981). For example, the School District was previously sued for violating the Establishment Clause by authorizing prayer and Bible reading exercises while *already under the supervision of a consent decree forbidding similar unconstitutional conduct*. *See Doe v. Stegal*, 653 F.2d 180, 185 (5th Cir. 1981). And Defendants have continued to engage in unconstitutional practices notwithstanding the Agreed Judgment *and* the pending Motion for Contempt. This record of law-breaking underscores the imminent need for the imposition of coercive sanctions. *Cf. NLRB v. A.W. Thompson, Inc.*, 651 F.2d 1141, 1145 (5th Cir. 1981); *NLRB v. Schill Steel Prods., Inc.*, 480 F.2d 586, 599 (5th Cir. 1973).[4]

## IV.   THE PRIOR ACT AWARDS CEREMONY PRAYERS ARE HIGHLY RELEVANT TO THE NEED FOR COERCIVE CONTEMPT SANCTIONS.

Evidence surrounding prayers delivered at previous ACT Awards Ceremonies is highly relevant to Plaintiff's Motion for Contempt, as it tends to show Defendants (1) have a pattern of

---

[4] Defendants do not specifically challenge Plaintiff's request for attorneys' fees. Plaintiff has adequately set forth the basis for awarding such fees. *See Seven Arts Pictures, Inc. v. Jonesfilm*, 512 Fed. Appx. 419, 422 (5th Cir. 2013); *United States v. Alcoa, Inc.*, 533 F.3d 278, 287-288 (5th Cir. 2008); *United States v. City of Jackson*, 359 F.3d 727, 734 (5th Cir. 2004); *Cook v. Ochsner Foundation Hospital*, 559 F.2d 270, 273 (5th Cir. 1977). Attorneys' fees are proper *irrespective* of whether the disobedience was willful. *Id. See also City of Jackson*, 359 F.3d at 735.

violating the Establishment Clause and disregarding the rights of students and (2) that Defendants knew a prayer would be delivered at the 2014 ACT Awards Ceremony yet did nothing to prevent it. The Federal Rules of Evidence broadly define "relevance" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. *See United States v. Hays*, 872 F.2d 582, 586 (5th Cir. 1989).

The evidence regarding prayers at past ACT Awards Ceremonies is obviously relevant to Plaintiff's Motion as it tends to make it more probable than not that Defendants will continue to violate the Establishment Clause absent coercive contempt sanctions. Such evidence shows that for many years, Defendants have been violating the Establishment Clause with impunity by opening each of these school-sponsored events with a Christian-themed prayer (by Christian clergy no less). Clearly, it was not enough that the Establishment Clause already very plainly prohibited such inclusion of prayer in a school-sponsored event. *See Lee*, 505 U.S. 577 and *Santa Fe*, 530 U.S. 290. The 2014 ACT Awards Ceremony prayer simply confirmed that Defendants have made no effort whatsoever to comply with the Agreed Judgment.

The evidence from previous ACT Awards Ceremonies is also directly relevant to Plaintiff's Motion for Contempt, insofar as it makes it more likely than not that Defendants knew a prayer would be delivered at the 2014 Ceremony yet intentionally or recklessly allowed the prayer to be delivered. While Defendants acknowledge that good faith is *not* a defense to civil contempt, such that they may be held liable even if they did not know a prayer would be delivered, the fact that knew a prayer would be offered and allowed it to be delivered, makes their actions even more contemptuous; in fact, it makes their actions criminal. *E.g.*, *United States v. Puente*, 524 Fed. Appx. 119, 121 (5th Cir. 2013) ("for a criminal contempt order, the district court must also find an additional element—that the defendant exhibited willful, contumacious intent, 18 U.S.C § 401(3), or a reckless state of mind, at the time the prohibited conduct occurred."). Even if Defendants were merely "reckless" in permitting the prayer, they could still be found criminally liable. *See United States v. Iqbal*, 684 F.3d 507, 512 (5th Cir. 2012)

13

("criminal contempt requires a . . . willful, contumacious, *or reckless* state of mind") (emphasis added); *United States v. Allen*, 587 F.3d 246, 255 (5th Cir. 2009) ("'willfulness' . . . . at a minimum requires a finding of recklessness"). *A fortiori*, such evidence is relevant here.

Not only does the evidence of past ACT Awards Ceremonies make it more likely than not that Defendants knew a prayer would be delivered at the 2014 ceremony, but it also tends to show that they knew *who* would deliver it. In each ceremony, the prayer was delivered by a Christian reverend, invited by the School District. Notably, Rev. Rob Gill delivered prayers in past ceremonies, including the 2012 Ceremony. (Exh. 7). The Assistant Superintendent expressly stated: "Good morning, my name is Matthew Evans, I am the Assistant Superintendent with the Rankin County School District. Please stand for our invocation, which will be led by Reverend Rob Gill, Senior Pastor of Saint Mark United Methodist Church. . . ."  After the prayer, Ann Sturdivant, then-president of the School Board, took the stage and delivered the following remarks: "Thank you Brother Rob, I can call him Brother Rob because he's my pastor." (*Id.*).

In addition to such evidence showing a pattern of contemptuous behavior, and willfulness on the part of Defendants, the evidence from past ceremonies corroborates the allegations in Plaintiff's Motion and reveals the degree to which Defendants have been in violation of the Establishment Clause in the past. For instance, in each ACT Awards Ceremony from 2011 until present, students were expressly asked by a school official to stand for the prayer. (Exh. 7). Each prayer was delivered by a Christian reverend, and the prayers were Christian in nature (*Id.*). In each ceremony, school administrators, including the Superintendent and principals, participated in the prayer by standing and bowing their heads in prayer while facing the student body. And in 2012, a school official announced that Rev. Gill was her pastor. Such facts make Defendants' actions even more egregious than those found unconstitutional in *Lee* and *Santa Fe*, putting them on notice that their actions in the 2014 Ceremony would be violative of the Agreed Judgment.

## V.   DEFENDANTS' GIDEON BIBLE POLICIES AND PRACTICES ARE RELEVANT TO THE RELIEF PLAINTIFF SEEKS.

There is no question that other School District policies and practices that violate the

Establishment Clause and thus, Agreed Judgment, are relevant to Plaintiff's Motion for Contempt, as such additional violations further the imminent need for coercive contempt sanctions here. In her Motion for Leave, Plaintiff more than sufficiently justified the relevancy of the evidence regarding the School District's practice of permitting the Gideons to infiltrate its elementary schools to distribute Bibles to young children – namely, that such actions demonstrate the need for coercive contempt fines to coerce Defendants into complying with the Establishment Clause and the Agreed Judgment. Such evidence is also relevant to necessity for such sanctions to be imposed on Defendants forthwith, as they continue to trample on the First Amendment rights of its students notwithstanding the Establishment Clause, the Agreed Judgment, previous consent decrees, and *even* a pending Motion for Contempt. Consequently, the relevancy of this evidence turns on whether Defendants' actions in actively supporting and facilitating the Gideons violated the Establishment Clause. As discussed below, they did.

Defendants do not deny that, while this motion for contempt was pending, the principal of an elementary school instructed fifth grade teachers to walk students through the hallway where Gideon Bibles would be distributed, *infra*. The principal instructed: "Gideons will set up in the lobby of the fifth grade building at 7:35. FIfth grade teachers - please walk your class through the lobby at that time." (Exh. 9). In fact, Defendants admit the Gideons were present at Northwest Rankin Elementary ("NRE") on October 17, 2014, to distribute such Bibles. (Dkt. 93-1 ¶4). Defendants also do not deny the fact that they were notified by the Americans United for Separation of Church and State, back in 2008, that such practice is unconstitutional.

What is even more troubling is the fact that even after Plaintiff filed her Motion to Leave to file the supplemental evidence regarding the Bible distribution at NRE, Plaintiff's counsel, Ms. Ellis, on November 30, 2014, received a complaint by a mother at another School District school, Flowood Elementary School, that it too was permitting the Gideons to distribute Bibles to young children on campus and during school hours. (Ellis Decl. ¶2, attached herein as Exhibit 15).

In defense of their recent actions at NRE, Defendants offer a single disclaimer that they claim was placed on a table in which the Bibles were distributed. (Dkt. 93-1). As discussed

below, such a disclaimer does not mitigate against the unconstitutional actions. *See, e.g.*, *County of Allegheny v. ACLU*, 492 U.S. 573, 600 (1989) ("The fact that the creche bears a sign disclosing its ownership by a Roman Catholic organization does not alter this conclusion. On the contrary, the sign simply demonstrates that the government is endorsing the religious message of that organization, rather than communicating a message of its own"); *Smith v. County of Albemarle*, 895 F.2d 953, 954-55 (4th Cir. 1990) (holding unconstitutional a crèche bearing a disclaimer reading "Sponsored and maintained by Charlottesville-Albemarle Jaycees not by Albemarle County").

Numerous courts, including the Fifth Circuit have explicitly ruled that a government's practice of assisting Gideons (or other entities) in distributing Bibles violates the Establishment Clause. *See Lubbock Civil Liberties Union v. Lubbock Independent Sch. Dist.*, 669 F.2d 1038 (5th Cir. 1982) (holding unconstitutional distribution of Gideon Bibles to fifth and sixth grade students)[5]; *Meltzer v. Bd. of Pub. Instruction*, 548 F.2d 559, 575-76 (5th Cir. 1977) ("the distribution of Gideon Bibles to public school students violates the First Amendment."); *Roark v. South Iron R-1 Sch. Dist.*, 573 F.3d 556, 561 (8th Cir. 2009) (affirming permanent injunction enjoining school district from "allowing distribution of Bibles" during the school day); *Doe v. S. Iron R-1 Sch. Dist.*, 498 F.3d 878, 882-84 (8th Cir. 2007) (same); *Berger v. Rensselaer Central Sch. Corp.*, 982 F.2d 1160 (7th Cir. 1993) (policy permitting Gideons to distribute Bibles during school hours violated Establishment Clause); *Roe v. Tangipahoa Parish Sch. Bd.*, 2008 U.S. Dist. LEXIS 32793, at *10-12 (E.D. La. Apr. 22, 2008) ("this Court determines that the distribution of Bibles was ultimately coercive . . . in violation of *Lee*; that distribution of Bibles is a religious activity without a secular purpose in violation of *Lemon*; and that the distribution by the Gideons amounted to promotion of Christianity by the School Board in violation of *County of*

---

[5] *See Ingebretsen v. Jackson Pub. Sch. Dist.*, 864 F. Supp. 1473, 1492 (S.D. Miss. 1994) (citing *Lubbock* for this proposition). The district court in *Duncanville*, 70 F.3d at 408 held that the distribution of Gideon Bibles in public schools was unconstitutional and enjoined the school district from "leading, authorizing, permitting or condoning the distribution of Bibles to students on school premises and during school hours." The Fifth Circuit vacated the order on standing grounds only.

*Allegheny.*"); *Jabr v. Rapides Parish Sch. Bd.*, 171 F. Supp. 2d 653 (W.D. La. 2001) (school board's action of making Bibles available to students in principal's office was an unconstitutional endorsement of religion); *Chandler v. James*, 985 F. Supp. 1094, 1101 (N.D. Ala. 1997); *Goodwin v. Cross Cnty. Sch. Dist. No. 7*, 394 F. Supp. 417 (E.D. Ark. 1973) (school board's practice of permitting religious organization to distribute Bibles violated Establishment Clause); *Tudor v. Bd. of Ed.*, 100 A.2d 857, 868 (N.J. 1953); *Brown v. Orange Cnty. Bd. of Public Instruction*, 128 So.2d 181, 185 (Fla. Dist. Ct. App. 1960). *See also Roark v. South Iron R-1 Sch. Dist.*, 540 F. Supp. 2d 1047, 1057 (E.D. Mo. 2008) ("Numerous cases have held that the distribution of Gideon Bibles . . . on school property and during school hours violates the Establishment Clause.").

The School District's actions fail the purpose prong of *Lemon* because there is no secular purpose in assisting Gideons in distributing Bibles. *See Berger*, 982 F.2d at 1170; *Roe*, 2008 U.S. Dist. LEXIS 32793, at *11; *Jabr*, 171 F. Supp. 2d at 660 (there was no secular purpose in permitting a principal to make Gideon Bibles available in his office). Clearly, a government practice that assists in tendering New Testament Bibles "has the purpose of promoting and approving Christianity." *Id*. *See also Meltzer*, 548 F.2d at 576 n.36.

Regardless of the purposes motivating it, the school's actions fail *Lemon's* second prong. *See Berger*, 982 F.2d at 1171 ("Though we are confident the school district's policy is not aimed at promoting the religious values of the Gideons, it does have the effect of sending a message to an objective observer that the Corporation endorses the Gideons' beliefs"). By assisting Gideons in distributing Bibles to a captive audience of elementary students, the School District sends the unequivocal message that the School District, as an institution, endorses the religious expressions embodied in the Bibles. *See Meltzer*, 548 F.2d at 575-76 ("the school board's use of the school system as a means of distribution amounts to its placing . . . its stamp of approval upon the Gideon version of the Bible"); *Berger*, 982 F.2d at 1171; *Roe*, 2008 U.S. Dist. LEXIS 32793, at *11; *Jabr*, 171 F. Supp. 2d at 663-64 (school's "action of permitting the principal of the school to offer, give, or make available Bibles . . . in his office . . . is an unconstitutional endorsement of

17

religion"); *Goodwin*, 394 F. Supp. at 427; *Brown*, 128 So.2d at 185.

The fact that the Bibles are distributed by Gideons representatives rather than by school officials is irrelevant. *See Meltzer*, 548 F.2d at 575 ("In the first wave of distribution, the Gideons simply walked into classrooms, . . . In the second wave of distribution, the Gideons set up a central Bible distribution point on campus, and students who wanted Bibles had to walk to the distribution center to get them. In both methods, however, the distribution took place with the permission of the school board and the local schools."). Indeed, the very first court to address the issue held: "It matters little whether the teachers themselves will distribute the Bibles or whether that will be done by members of the Gideons International. The same vice exists, that of preference of one religion over another." *Tudor*, 100 A.2d at 868.[6] *See also Berger*, 982 F.2d at 1164 (Gideons sent representatives to distribute Bibles); *Roe*, 2008 U.S. Dist. LEXIS 32793 (same); *Goodwin*, 394 F. Supp. at 428 (the practice "permitted by the school authorities of distributing the Gideon Bible by a representative of the Society to the fifth grade students in the elementary schools of the Cross County School District is an exercise of religious character which is prohibited by the First Amendment"); *Jabr*, 171 F. Supp. 2d at 660 ("in *Berger*, the classroom teachers did not even participate in the handing out of the Bibles, they merely observed private citizens, known as Gideons, distribute the Bibles to students.").[7]

The unconstitutional endorsement is even more troubling here because the Bibles were distributed to *elementary* students. Elementary students are vastly more impressionable than high school students and are more likely to perceive the school's actions as an endorsement of religion. *See Morgan v. Swanson*, 659 F.3d 359, 382 (5th Cir. 2011); *Walz v. Egg Harbor Twp. Bd. of Educ.*, 342 F.3d 271, 277 (3d Cir. 2003) (in "an elementary school" the line "between school-endorsed speech and merely allowable speech is blurred" and that elementary students "are different.") (citation omitted); *Peck v. Upshur Cnty. Bd. of Educ.*, 155 F.3d 274, 288 n* (4th

---

[6] The Fifth Circuit agrees that *Tudor* is the "leading case to consider the issue of the constitutionality of Bible distribution to public school children." *Meltzer*, 548 F.2d at 574.

[7] *Cf. Stone v. Graham*, 449 U.S. 39, 42-43 (1980) ("It does not matter that the posted copies of the Ten Commandments are financed by voluntary private contributions") (citations omitted).

Cir. 1998).[8] In *Peck*, for instance, the Fourth Circuit reviewed the constitutionality of a school board's equal access policy allowing the limited (once a year) display of religious *and* non-religious materials by private groups in elementary and secondary schools. Despite the board's efforts to avoid endorsement through a disclaimer, the court held the policy unconstitutional "to the extent that it allows . . . religious material in the elementary schools." *Id.*

In this context, no disclaimer could effectively negate the unconstitutional religious endorsement. *See Allegheny*, 492 U.S. at 600; *Stone*, 449 U.S. at 40 (holding that such a disclaimer is not sufficient to avoid a conflict with the Establishment Clause); *Freiler v. Tangipahoa Parish Bd. of Educ.*, 185 F. 3d 337, 346 (5th Cir. 1999); *Smith*, 895 F.2d at 954-55; *Borden*, 523 F.3d at 177 n.20 ("Borden's claim that the School District could remove any Establishment Clause violation by writing a disclaimer saying that Borden's speech does not represent the ideals of the School District is simply wrong."); *Lassonde v. Pleasanton Unified Sch. Dist.*, 320 F.3d 979, 984 (9th Cir. 2003) ("Regardless of any offered disclaimer, a reason-able dissenter still could feel that there is no choice but to participate in the proselytizing in order to attend high school graduation."); *Adland v. Russ*, 307 F.3d 471, 488 (6th Cir. 2002) ("the disclaimer is ineffective"); *ACLU v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471, 1487 (3d Cir. 1996) ("Despite the printed disclaimer, the reasonable observer here could not help but conclude that the Board favors the inclusion of prayer.").

The school district's actions are also "unconstitutional when measured by the third prong of the *Lemon* test." *Jabr*, 171 F. Supp. 2d at 661 ("when the School Board permitted the principal to make Bibles available to students in the principal's office, the principal became excessively entangled with religion."). *See also Roe*, 2008 U.S. Dist. LEXIS 32793, at *11 ("as for prong three, the teachers who . . . direct[ed] [the students] to the principal's office, became excessively entangled with religion."). In *Berger*, the Seventh Circuit held that "[t]eachers, who did not actively participate in Bible distribution, but merely observed non-school personnel

---

[8] *See also Bell v. Little Axe Independent School Dist.*, 766 F.2d 1391, 1404 (10th Cir. 1985) ("Elementary schoolchildren are vastly more impressionable").

distribute the material, became excessively entangled with religion." *Id.* (citing *Berger*, 982 F.2d at 1162-63). Here of course, unlike in *Berger*, the teachers were not merely passive observers but were expressly instructed to assist the Gideons by making the children walk through the lobby.

Because the fifth grade students were a captive audience, Defendants also violated the Establishment Clause under the coercion test. *Lee*, 505 U.S. at 587. Applying *Lee*, the Seventh Circuit in *Berger* held that a school's "practice of assisting Gideons in distributing Bibles . . . is a far more glaring offense to First Amendment principles than a nonsectarian graduation prayer." 982 F.2d at 1169. *See also Meltzer*, 548 F.2d at 574; *Roe*, 2008 U.S. Dist. LEXIS 32793, at *10-11; *Jabr*, 171 F. Supp. 2d at 661-62 ("[e]ven when we assume that the principal 'passively' or 'neutrally' offered the Bibles to the students, . . . [t]he pressure created by the principal in his office was coercive and, thus, illegal."); *Goodwin*, 394 F. Supp. at 427.[9]

In view of the above, Defendants' actions in instructing fifth grade teachers to walk impressionable elementary school students through a hallway where Gideon Bibles were distributed violates the Establishment Clause. While Plaintiff cannot prevent Defendants from violating every First Amendment freedom, she can invoke this Court's continuing jurisdiction over the Agreed Judgment to ensure enforcement of its terms, *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004); *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 381 (1994); *Jackson v. Lowndes Cnty. Sch. Dist.*, 2010 WL 91245, *7 (N.D. Miss. 2010). That said, the Court can and should take judicial notice of Defendants' systemic policies and practices of discriminating against minorities and infringing upon all First Amendment freedoms, most recently evidenced by their newly-adopted policy against "gay clubs."[10]

---

[9] Any claim by the School District that it established a "public forum" for private speech is belied by the actual facts in this case. For one thing, the "evidence shows that the only group who has been allowed access" to distribute materials "is the Gideons." *Roark*, 540 F. Supp. 2d at 1058. *See also Berger*, 982 F.2d at 1166 (rejecting free speech defense). Moreover, the Supreme Court "ha[s] never held the mere creation of a public forum shields the government entity from scrutiny under the Establishment Clause." *Santa Fe*, 530 U.S. at 303 n.13; *see Roark*, 573 F.3d at 561 (same); *Berger*, 982 F.2d at 1168.

[10] Kate Royals, "Proposed LGBT club prompts new Rankin school policy," *The Clarion-Ledger* (January 15, 2015) *available at* http://www.clarionledger.com/story/news/local/2015/01/14/rankin-schools-gay-club-policy/21745481/ (accessed January 16, 2015), attached as Exhibit 16. School Board members

## VI.    THE SUPPLEMENTAL EVIDENCE IS ADMISSIBLE.

In her Motion to Leave, Plaintiff set forth the foundation for each contested exhibit offered in the supplement. Nevertheless, Defendants still challenge Exhibits 9, 10 and 11 on foundation grounds (Dkt. 93). At the same time, they concede Exhibit 9 is what Plaintiff says it is. They admit: "Exhibit '9' is a memorandum authored by Kara Killough dated October 7, 2014." (*Id.* at ¶2). On this basis alone, it satisfies FED. R. EVID. Rule 901. Indeed, Ms. Killough does not deny that she sent said email (Dtk. 93-1) and even corroborates it, admitting: "Representatives of a Gideon organization on or about October 7, 2014 were present at our school." (*Id.* at ¶4). To put to rest any remaining concerns over authenticity, Plaintiff offers the declarations of Monica Miller, who authenticates Exhibits 9 and 10, and Ian Smith, who sent the letter in Exhibit 11. The declaration of Dianne Herman Ellis is also offered to authenticate Exhibit 11. (Ellis Decl. ¶8).[11]

In addition, none of these exhibits pose hearsay problems. Exhibit 9 amounts to an admission by a party opponent. FED. R. EVID. Rule 801 (d). Exhibit 10, AHA's letter, is not offered for its truth, but is offered to show: (1) Defendants have been put on notice of an unconstitutional practice and (2) Defendants have failed to respond to the concerns raised therein. Exhibit 11, AU's letter to Defendants, is similarly not offered for its truth, but rather, to show Defendants had been on notice of their unconstitutional practices since 2008. (Ellis Decl. ¶8).

Defendants' objections to Exhibits 5 through 8 are equally meritless, as the majority of this evidence was also produced to Plaintiff in discovery, and therefore needs no additional authentication. The only evidence not produced in discovery was the video footage of previous ACT Awards Ceremonies. Defendants objected to producing such videos in discovery asserting, *inter alia*, that doing so would be "unduly burdensome" and not likely to lead to the discovery of

---

approved a change in the School District's school club policy on January 14, 2015, in an attempt to prevent students from creating what Weathersby referred to as "gay clubs." Weathersby reportedly stated, "I talked to (board attorney) Freddie (Harrell) and several administrators about what we could legally do to limit organizations like that on campus that we don't want to endorse and don't want." The Court can take judicial notice of this article, as well as Defendants' statements. Fed. R. Evid. 201. *See also Doe v. Stegall*, 653 F.2d 180, 183 n.6 (5th Cir. 1981) (accepting exhibit of Jackson Clarion-Ledger article).

[11] Of course, these declarations are unnecessary to authenticate said letters. *See* FED. R. EVID. Rule 901(b)(4). *See also United States v. Siddiqui*, 235 F.3d 1318, 1323 (11th Cir. 2000); *Greenbaum v. United States*, 80 F.2d 113, 125 (9th Cir. 1935).

"admissible evidence." (Exh. 3, NO.15). The undue burden objection must be rejected outright, as Defendants had already produced the videos in response to the records request. *See United States v. Brown*, 688 F.2d 1112, 1115-16 (7th Cir. 1982). And as noted above, the videos are relevant. Accordingly, all of the supplemental evidence is relevant and admissible.

## VII.    CONCLUSION

Defendants admit they violated Plaintiff's rights under the Establishment Clause in connection with the 2014 ACT Awards Ceremony and that such activity violates the Agreed Judgment. Therefore, at a minimum, this Court must find them in contempt and award Plaintiff compensatory damages. For the reasons set forth above and in Plaintiff's previous memoranda, this Court should also award coercive contempt fines to coerce Defendants into complying with the Establishment Clause in the future, and should award Plaintiff's attorneys' fees and costs and any further relief the Court deems just and proper.

Respectfully submitted,

January 21, 2015            s/ Monica L. Miller
                            Monica L. Miller
                            American Humanist Association
                            1777 T Street, N.W., Washington, D.C. 20009
                            Telephone: (202) 238-9088 / Fax: (202) 238-9003
                            mmiller@americanhumanist.org
                            CA Bar # 288343 / DC Bar # 101625

                            David A. Niose
                            Law Offices of David Niose
                            348 Lunenburg Street, Suite 202
                            Fitchburg, MA 01420
                            978-343-0800, dniose@nioselaw.com
                            MA Bar: 556484

                            Rita Nahlik Silin
                            Silin & Ellis
                            1161 Robinson Avenue, Ocean Springs, MS 39564
                            Telephone: (228) 447-4118
                            rsilin@gmail.com
                            MSB #102662

                            Dianne Herman Ellis

Silin & Ellis
1161 Robinson Avenue, Ocean Springs, MS 39564
Telephone: (228) 447-4118
diannernjd@aol.com
MS Bar No. 102893

David J. P. Kaloyanides
DAVID J.P. KALOYANIDES, APLC
15338 Central Avenue
Chino, CA 91710
213/623-8120
Fax: 213/402-6292
CA BN 160368

**ATTORNEYS FOR THE PLAINTIFF**