# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**M.B.**, a minor by and through her next
friend, **KANWAR SINGH BEDI**                                    **PLAINTIFF**

**V.**                                    **CIVIL ACTION NO. 3:13cv241-CWR-FKB**

**RANKIN COUNTY SCHOOL DISTRICT**
and **CHARLES FRAZIER**, Individually and
in his Official Capacity as Principal of Northwest
Rankin High School                                    **DEFENDANTS**

## <u>ORDER</u>

Before the Court is Plaintiff's Motion for Contempt [Docket No. 64]. Defendants have

responded [Docket No. 68], and Plaintiff has replied [Docket No. 70]. After review of the

evidence and the arguments of counsel, the Court finds that Defendant,[1] Rankin County School

District, has wilfully violated the Consent Decree entered by this Court on November 22, 2013,

by advancing and endorsing religion and by coercing students to participate in religious activity.

For the reasons stated herein, Plaintiff's motion is granted in part.

## I.    Background

On April 24, 2013, M.B., a student enrolled in Northwest Rankin High School,  filed a

lawsuit through her next friend, Kanwar Bedi, against the Rankin County School District ("the

District") and Charles Frazier, the school's principal, seeking injunctive and declaratory relief

and damages under 42 U.S.C. § 1983. In particular, M.B. raised a constitutional challenge to

Defendants' practice of including Christian sermons and prayers in student assemblies. The

complaint stemmed from a series of "Christian Assemblies" conducted during school hours on

---

[1]    Throughout this Order, unless otherwise indicated, "Defendant" or "Defendants" refers to the Rankin
County School District, including its officials.

April 10, 2013, which proselytized Christianity. "Church Representatives" spoke and a video presentation was shown to students on the topic of "finding hope in Jesus Christ." *See* Docket No. 5, at 5. M.B., who at the time was a sixteen year old junior at the high school, believed that her attendance at the event was mandatory.

The District ultimately admitted that M.B.'s First Amendment rights were violated and, on July 17, 2013, it adopted a Religion in Public Schools Policy ("Religion Policy") outlining standards for ensuring that its schools conformed with the First Amendment's Establishment Clause. Docket No 63-1. The following school term (M.B.'s senior year), on November 22, 2013, this Court entered an Agreed Judgment incorporating the Religion Policy and ordered the District to comply with that policy. Docket No. 63, at 2. The policy was adopted "to make clear and demonstrate that its policy is to fully comply with the Establishment Clause of the First Amendment of the United States Constitution." *Id*. Through the Agreed Judgment, the District also consented to pay M.B.'s attorneys fees. The case was dismissed with prejudice. *Id*.

Six months later, on May 6, 2014, M.B. filed a Motion to Enforce Consent Decree and Motion for Civil Contempt. Docket No. 64. The action was triggered by a school assembly held within the District on April 17, 2014, wherein school officials "invited a Christian Reverend to deliver a prayer at a school-sponsored event." Docket No. 64, at 3. More specifically, the District organized and sponsored a district-wide awards ceremony ("ACT Ceremony") honoring those students who scored above 22 on their ACT. M.B. was one of honorees. The program was held at Brandon High School during regular school hours.

M.B. argues the District violated the "Consent Decree" by including a Christian Reverend to offer a prayer as part of the program. Docket No. 65, at 6. She alleges that the District's actions violated the Establishment Clause and the core elements of the District's Religion Policy which mandate that: "school activities conducted during instructional hours

should neither advance, endorse or inhibit any religion; should be primarily for secular purposes and should not obligate or coerce any person into participation in a religious activity." *Id.*

The District presents several arguments in response. Each will be addressed in more detail further in this opinion but, in setting forth the chronology of events, they are mentioned here. The District first alleges that the filing before the Court is procedurally defective. Specifically, the District contends that M.B. was required to file another civil action because the case was dismissed with prejudice. The District submits that the label, "Consent Decree," which M.B. ascribes to the pleading is wrong since the Court entered a Final Judgment, which dismissed the case with prejudice. Hence, the current motion is invalid because it effectively "serves as a motion for summary judgment under Federal Rule of Civil Procedure 56," says the District. Docket No. 64, at 1. Further, the District argues it is "entitled to the protections of Rule 56(d) and should be allowed a period of discovery with respect to Plaintiff's allegations." *Id.* at 2.

To address this concern, the court initiated a telephonic conference with the parties and ordered that written discovery and depositions be completed on or before December 10, 2014. *See* ECF, 10/7/2014. The discovery deadline was later extended to December 19, 2014. *See* ECF, 10/24/2014.[2] After completing discovery, Plaintiff filed a Motion for Leave to File Supplemental Memorandum and Evidence Obtained in Discovery. Docket No. 83. The Court granted Plaintiff's motion on January 12, 2015. Docket No. 89.

Through the supplemental memorandum, M.B. buttresses the allegations concerning the 2014 ACT Ceremony. Docket No. 90. Astonishingly, the memorandum also details more alleged Establishment Clause violations by the District. Plaintiff asserts that on October 13, 2014, after

---

[2] One of the reasons discovery was extended was to accommodate the schedule of the parties. M.B. is now enrolled in college. So that her studies would not be interrupted, the parties agreed that M.B.'s deposition could be taken at the end of the academic semester.

M.B. had graduated but while the Motion for Contempt was still pending, the District assisted the Gideons in distributing Bibles at one of its elementary schools. *Id.* at 10-12 ("[T]he principal of Northwest Rankin Elementary sent an email to faculty instructing all fifth grade teachers to walk fifth grade students through the lobby where Gideon Bibles would be distributed."). M.B.'s counsel then wrote a letter to the principal, the superintendent, and the District's counsel advising that they were of the opinion that the District's action not only violated the First Amendment, but that it "also demonstrate[d] a complete disregard for the Consent Decree, or worse, an unwillingness to comply with its terms." Docket No. 90-10. Plaintiff's supplemental memorandum also elaborated on additional Establishment Clause violations purported to have occurred at other District ACT ceremonies prior to 2013. Docket No. 90, at 3-7.

Along with their procedural push back, Defendants raise several arguments challenging the merits of Plaintiff's contempt allegations. First, they argue that, because it was not mandatory for M.B. to attend the ACT Ceremony, the District's actions did not violate the Establishment Clause. Docket No. 94, at 3. Secondly, the District contends that any liability arising from a First Amendment violation should be excused since school officials are ill-equipped to understand the complexities of constitutional law. *Id.* Lastly, Defendants argue the principal of Northwest Rankin High School, Charles Frazier, is protected from liability because his mere participation in the ACT Ceremony does not constitute a violation of the Agreed Judgment. Docket No. 95.

In response to the claim regarding the Gideon Bible distributions, the District challenges the admissibility of evidence on which M.B. relies. Even if the evidence is admissible, the District maintains that disclaimers were placed on the tables from which the Bibles were disseminated. *See* Docket No. 93-1, at 3 (document giving notice that "[t]he free material on this table is offered by: Gideons International . . . and not authored or endorsed by the school district"). Thus, there is no liability, the District contends.

As explained more fully below, all but one of the District's arguments must be rejected.

## II.    Legal Standard

In order for the Court to find the Defendants in contempt, M.B. must prove "by clear and convincing evidence 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 581-82 (5th Cir. 2005) (citations omitted). "The evidence must be so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.' *Id.* at 582. (internal quotation marks and citations omitted).

"A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Travelhost, Inc. v. Blandford*, 68 F. 3d 958, 961 (5th Cir. 1995) (quotation marks and citation omitted). "[T]he question is not one of intent but whether the alleged contemnors have complied with the court's order." *Jim Walter Res., Inc. v. Int'l Union, United Mine Workers of Am.*, 609 F.2d 165, 168 (5th Cir. 1980) (citation omitted). What matters is that the contemnor actually failed to comply with the court's order as the action need not be willful. *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000) (citing *NLRB v. Trailways, Inc.*, 729 F.2d 1013 1017 (5th Cir. 1984)). Furthermore, "[g]ood faith is not a defense to civil contempt; the question is whether the alleged contemnor complied with the court's order." *Chao v. Transocean Offshore, Inc.*, 276 F.3d 725, 728 (5th Cir. 2002).

Upon a finding of contempt, the district court has broad discretion in assessing sanctions, which may be employed for "either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Am. Airlines*, 228 F.3d at 585 (quotation marks and citations omitted); *see also Test Masters*, 428

F.3d at 582 (sanctions may be levied to protect the sanctity of the court's decrees and the legal process). The amount of any damages is left to the broad discretion of the Court. *See Am. Airlines, Inc. v. Allied Pilots Ass'n*, 53 F. Supp. 2d 909, 939 (N.D. Tex. 1999) *aff'd*, 228 F.3d 574 (5th Cir. 2000).

## III.    Discussion

### A.    *Agreed Judgment v. Consent Decree*

As a preliminary matter, the Court will address the District's argument that this cause is not properly plead because a final judgment has been entered. According to the District, this means there has been a final outcome and, as a result, Plaintiff was required to file a new complaint.

To support this contention, the District asserts that Rules 2 and 3 of the Federal Rules of Civil Procedure demand that M.B. file a new civil action for the relief now sought. Docket No. 69, at 1. The language of Rule 2 commands that individual civil actions be brought by "a single action and mode of procedure," while Rule 3 instructs that a complaint must be filed to initiate a civil action. FED. R. CIV. P. 2, 3. The Agreed Judgment dismissed this action with prejudice. Defendant argues that by now transforming the Court's final judgment into a consent decree, M.B. is essentially seeking summary judgment because the action impedes access to certain procedural safeguards, such as a period of discovery and an opportunity to answer. Docket No. 69.

The debate by the parties over whether the final judgment was dispositive stems from disagreement over how the term "Consent Decree," as used in these proceedings, should be interpreted. It is not necessary, however, for the Court to undergo an arduous study of the nomenclature used to label the pleading at Docket No. 63. What is important is that the parties consented to settle their disputes through the provisions set forth in the Agreed Judgment. *See*

*e.g., Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 538 (1986) (citation omitted) ("No one would dispute that a consent decree requires the consent of the parties, and that a consent decree may be an effective way to settle a lawsuit."); *City of El Paso, Tex. v. El Paso Entm't, Inc.*, 464 Fed. Appx. 366, 370 (5th Cir. 2012) ("Agreed judgments are not distinguishable from consent decrees, and so we treat the two under equivalent interpretive principles.") (citation omitted). S*ee also United States v. Alcoa, Inc.*, 533 F.3d 278, 288 (5th Cir. 2008) (holding that the parties' settlement bound plaintiff citizens to "an enforceable judicial order" and that "[c]onsent decrees are judgments despite their contractual nature, and district courts may fashion remedies to enforce prior judgments") (quotation marks and citation omitted); *Ruiz v. Estelle*, 161 F.3d 814, 822 (5th Cir. 1998) ("The Final Judgment is a consent decree. Black's Law Dictionary defines *consent decree* as '[a] judgment entered by consent of the parties.'") (citation omitted) (emphasis in original). Agreed judgments and consent decrees may be treated interchangeably.  The words used *in* that document are what matter.

Presumably, the parties negotiated the terms. The terms required that the District pay M.B. attorney's fees and, more importantly for the proceedings now before the Court, the District agreed to "comply with the provisions of its Religion in Public Schools Policy." Docket No. 63. After they shook hands on all of the terms, the parties involved the Court by submitting the Agreed Judgment for its examination, review, approval and entry.

Furthermore, the instant motion is "not an institution of an independent proceeding but is part of the original cause." *Hodgson v. Hotard*, 436 F.2d 1110, 1114 (5th Cir. 1971). M.B. simply alleges that the District has failed to comply with the provisions of its Religion in Public Schools Policy. The Court, therefore, rejects the District's argument that M.B. has to start from scratch and institute a new civil action. "A consent order, while founded on the agreement of the parties, is nevertheless a judicial act, enforceable by sanctions including a citation for contempt."

*Whitfield v. Pennington*, 832 F.2d 909, 913 (5th Cir. 1987) (citing *U.S. v. Miami*, 664 F.2d 435, 439-40 (5th Cir. 1981)).

Also, the District argues that a period of discovery only follows the filing of a new action. However, following the filing of Plaintiff's motion, the Court allowed discovery, and the District took advantage of that opportunity. *See, e.g.*, Docket Nos. 72, 73 and 94-1. Therefore, the concern over the lack of discovery is now inconsequential, and any perceived prejudice has been cured.

For the foregoing reasons, this Court interprets the Agreed Judgment as a consent decree and retains subject matter jurisdiction for enforcement purposes. This Court has the power and duty to enforce its orders through its contempt power whether the order is styled or labeled an Agreed Judgment, a Consent Judgment, a Consent Decree or an Agreed Order. The motion for contempt, therefore, is properly before the Court.

In urging the Court to find the District in contempt of the Agreed Judgment, M.B. points to events which establish that Defendants egregiously violated the terms of that judgment. Each will be addressed in kind.

B.     *2014 ACT Ceremony*

The prayers and associated activity at the April 17, 2014, ACT Awards ceremony prompted the filing of the instant motion. The material facts are not in dispute. Simply put, a Christian prayer was delivered by a reverend at the opening of this school-sponsored event. The District concedes, *see* Docket No. 94, at 4, that the ACT Ceremony's opening invocation falls within the conduct prohibited as coercive and in violation of the Establishment Clause by the Supreme Court in *Lee v. Weisman*. 505 U.S. 577 (1992).

M.B. has submitted evidence which demonstrates that the challenged practice is routine within the Rankin County School District, and that the 2014 ceremony was basically business as

usual, following a similar format from prior years.[3] More precisely, video reveals that not even five minutes into the event, students were instructed by Reverend Rob Gill to "[b]ow [their] heads in prayer" and were led in a prayer. Among other things, the prayer thanked God for "creative minds and faithful instruction," and it concluded with the words, "[i]n the name of the Father, and the Son, and the Holy Spirit, amen," giving honor to the Holy Trinity which is a fundamental tenet of the Christian faith. Without refuting any of the highly persuasive evidence provided to support Plaintiff's motion for contempt, the District instead argues that evidence of past ceremonies is irrelevant.

The Court finds, however, that the prior years' ceremonies are indeed relevant. A comparison between the 2014 ceremony and those from prior years shows that the 2014 event proceeded in its traditional fashion. Despite its Religion Policy and the Agreed Judgment, the District did not alter the program or its behavior. Evidence from prior years' ceremonies is probative and it aids the Court in determining whether the District has acted in *wilful* violation of the Agreed Judgment.

First Amendment jurisprudence is replete with cases prohibiting nonsectarian prayers in public school. *See e.g., Lee*, 505 U.S. at 577; *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000). Incorporating basic Establishment Clause principles, the District's Religion Policy explicitly states that "school activities conducted during instructional hours should neither advance, endorse or [sic] inhibit any religion." The 2014 ACT ceremony violated that policy. This fact is unrefuted and even conceded by the District. *See supra* p. 9. Notwithstanding, the

---

[3]     Evidence of previous ceremonies illustrates that it is customary for the District to open the ACT awards ceremonies with a Christian prayer lead by church officials, followed immediately by a recital of the Pledge of Allegiance. *See* Docket No. 90-7, at 2 (transcript of video from the 2011 ceremony which began with a prayer from "Brother David Jett, Senior Pastor of Crossgates Baptist Church"); *Id*. at 3 (transcript of video from the 2012 ceremony which began with an introduction of the pastor by the District's Assistant Superintendent "Reverend Rob Gill, Senior Pastor of Saint Mark United Methodist Church" leading the students in prayer).

District proffers several excuses for why it should not be held in contempt, but each crumbles under the least possible amount of scrutiny.

First, the District argues that, because M.B.'s attendance at the 2014 school assembly was not mandatory, this situation is not comparable to the student led assembly which spawned the Court's November 2013 Agreed Judgment. To support this position, the District points out that M.B. did not receive a formal invitation to the event and that she even acknowledges that "it was not compulsory." Docket No. 94, at 3 (citing M.B.'s Deposition, at p. 6). It is well-settled, however, that the voluntary nature of a school-sponsored unconstitutional event does not cure it from being coercive and in violation of the Establishment Clause. *See*, *e.g.*, *Lee*, 505 U.S. at 595 (reasoning that the attendance at graduation and promotional ceremonies being voluntary was a formalistic argument because "absence would require forfeiture of those intangible benefits which have motivated the student through youth and all her high school years"); *Santa Fe Indep. Sch.*, 530 U.S. at 292 (finding that, even though high school football games were voluntary, prayers conducted at them were still coercive due to the pressure it placed on students to make "the difficult choice between attending [the] games and avoiding personally offensive religious rituals").

Despite the District's insistence to the contrary, the fact that attendance was optional, is immaterial. The event was still coercive as it unnecessarily required Plaintiff to make the difficult decision between being exposed to a religious ritual she found objectionable or not attend an event honoring her and other students for their academic excellence. No doubt it was an honor for her to be among the group of award recipients for whom this event was planned. M.B. (and the other students) should have received her accolades without being subjected to the deeply religious prayers and messages of a preacher.

Moreover, M.B. discusses the coercive effect of the invocation and surrounding activities. Prior to the event, for example, M.B. avers that students being honored were notified of the program and instructed to "dress in church attire." Docket No. 64-2 (M.B.'s Declaration). During the ceremony, she states that she did not wish to stand for the prayer or bow her head, but "felt pressured and compelled" to do both. *Id.* So, after attending the ACT Ceremony with the anticipation of being celebrated for her achievement, M.B. was pressured into participating in a religious exercise which may or may not have corresponded with her personal beliefs. *See Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 289-90 (1963) ("[E]ven devout children may well avoid claiming their right and simply continue to participate in exercises distasteful to them because of an understandable reluctance to be stigmatized as atheists or nonconformists simply on the basis of their request.").

The District next contends that the Court should consider the complexities of First Amendment law and the difficulty laypersons face when attempting to comply with it. They argue that the Supreme Court's decision in *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014), handed down on May 5, 2014, confirms the density of First Amendment jurisprudence. In *Town of Greece*, the closely divided Court found that legislative prayer need not be nonsectarian and that the town did not violate the First Amendment by opening town board meetings with Christian prayers that aligned with traditions of the United States. *Id.* at 1824.

Advancing the decision of *Town of Greece* is the District's version of a Hail Mary Pass. On the one hand, the District claims that *Town of Greece* provides an apparent inconsistency in constitutional law which bolsters its contention that "a lay person is not equipped to undertake the study and interpretation that a lawyer brings to a question of law." Docket No. 94, at 3. On the other hand, the District has previously told the Court that its "Religion Policy is stated in *terms which are clear and easily understood by teachers, administrators, other school officials,*

and any groups seeking to make use of the school facilities." *See* Docket No. 20, at 6 (Memo. of Auth. in Support of Defs.' Mot. for Partial Summary) (emphasis added).

*Town of Greece* is not the source of confusion as the District contends. Here, Defendants were previously before the Court for similar constitutional violations. At the time of the 2014 ACT Ceremony in question, not even six months had lapsed since the parties entered into the Agreed Judgment -- a decree which *also* stemmed from the promotion of Christianity during a school-sponsored event. Not only was it informed, the District drafted a Religion Policy meant to "make clear and demonstrate that its policy is to fully comply with the Establishment Clause of the first Amendment of the United States Constitution." Docket No. 94, at 4. Also, as mentioned, in an earlier motion for partial summary judgment, Defendants professed that the Religion Policy is stated in unambiguous and easily discernable terms. *See id. Town of Greece* has sparked no confusion nor has it injected any ambiguity into the parties Agreed Judgment.

Seeking to avoid a finding of contempt, the District also maintains that the Public Relations Director, Robin Haney, who was responsible for organizing the ACT Ceremony, did not understand that an invocation would violate the Agreed Judgment. *See* Docket No. 94-2 (Affidavit of Robin Haney) (admitting that, although she did not consult with district personnel to ensure that the 2014 ACT Ceremony met regulations, she believed that following the same procedure from prior years was permissible since this event was not a student-led assembly and Plaintiff was not obligated to attend it). Because Haney did not believe the opening invocation violated its Religion Policy, there was no deliberate violation, says the District.

It may be true that the ceremony's organizer did not *know* the invocation was prohibited; however, *knowledge* implies that one has first been informed. Haney's lack of knowledge generates a number of questions, which the District has not answered. For example: what steps did the District take to inform its employees of its Religion Policy incorporated in the Agreed

Judgment?; who was responsible for informing district employees of the policy?; since Haney acted alone in preparing the program, was there a process of approval for the content of the program? [4] Any ignorance on Haney's part and the apparent ignorance of the other district officials is more reflective of an absence in effort to comply with the Agreed Judgment than it is of the District's good faith attempt to comply. The fact that several school officials, presumably all the principals from the various high schools, and other administrators (including the superintendent) attended and participated in the ceremony, and no one realized the violations of the District's Religion Policy is perplexing to the Court. It also speaks volumes.

To ensure full compliance with the Court's decree and the Establishment Clause required the District to regulate school programs so that they conformed with the Religion Policy's directives. The District is responsible for properly instructing school personnel and guaranteeing that activities comply with District policy. *See Lemon v. Kurtzman*, 403 U.S. 602, 619 (1971) ("The State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion."); *see also Moss Point School Dist. v. Stennis*, 132 So.3d 1047, 1050 (Miss. 2014) (explaining that Miss. Code Ann. § 37-9-69 imposes a duty on each superintendent, principal and teacher in the public schools to observe and enforce the statutes, rules and regulations prescribed for the operation of schools and those rules and regulations created by the district which impose a positive duty on a school). Consequently, the argument that the District should be excused from liability because school personnel acted in good faith is untenable.

Furthermore, even if Haney and other district personnel acted in good faith, it is well-established that "good faith" is not a defense to civil contempt. *Waffenschmidt v. MacKay*, 763

---

[4]     "Invocation" by "Rev. Rob Gill of St. Marks United Methodist Church" was prominently located at the top of the program for the ACT Ceremony. Docket No. 90-3 at 20. In preparation for the event, emails were disseminated from Haney to multiple school officials, including Superintendent Weathersby and Principal Frazier. *See* Docket Nos. 90-3, at 89; *see also Id*. at 46, 47, 48, 62, 63. At the very least, one would expect that Frazier and the District (named defendants in the lawsuit which spawned the Agreed Judgment) would provide instructions to the individual responsible for coordinating the event.

F.2d 711, 726 (5th Cir. 1985); *Chao v. Transocean Offshore, Inc.*, 276 F.3d 725, 728 (5th Cir. 2002) (citation omitted). This is a point on which the District agrees. *See* Docket No. 94, at 3 ("The School District understands that good faith is not a defense to an allegation of civil contempt."). Hence, school officials' good faith belief that it was permissible to invite a Christian reverend to perform the opening prayer of a school sponsored event cannot absolve the District from a finding that it violated the terms of the Agreed Judgment.

Ultimately, the only relevant inquiry here is "whether the alleged contemnor complied with the court's order." *Chao*, 276 F.3d at 728. The District was responsible for guaranteeing that school activities had a secular purpose and did not require or coerce any person's participation in a religious activity. As with past District activities, the invocation at the April 17, 2014 ACT Ceremony blatantly violated these mandates. The preacher-lead prayer at this event was an affront to M.B. and any of the other students who may not have shared the same beliefs espoused by the reverend. In fact, even those who are of the Christian faith (which may have included M.B.) could have taken exception.[5] Regardless of the faith shared by a fraction or by the majority of its pupils, schools owe a duty to all students to refrain from conduct which gives the appearance of advocating a particular religion. In fairness to and protection of all, they must remain neutral. This same duty is owed to the parents who submit their children to the protection of educators, entrusting that they will sharpen their academic minds. Parents don't drop off their children at the school house door to have their child's religious beliefs affirmed, questioned or compromised. *See Lee*, 505 U.S. at 643-44 ("Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom

---

[5]     It is not lost on the Court that nowhere in the pleadings, materials, or evidence is there an assertion that M.B. is a non-Christian. The concern here is that proselytizing by preachers has no place within the community's public school. It matters not whether she is a Christian or non-Christian.

will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family.") (citation omitted).

In sum, the Court finds that the 2014 ACT Ceremony violated the Agreed Judgment, and the District is in contempt.[6]

C. *Distribution of Gideons Bibles - "Please walk your class through the lobby"*

Following the entry of the Agreed Judgment, evidence establishes that on October 13, 2014, the principal of Northwest Rankin Elementary School (also, "NRE") instructed all fifth-grade teachers to walk their students through a hallway where members of a Christian association, Gideons International, were distributing Bibles. Through an email, the principal informed teachers that the "Gideons will set up in the lobby of the fifth grade building at 7:35. Fifth grade teachers - please walk your class through the lobby at that time." Docket No. 90-9, at 3. Although the District posed various objections to the evidence, it does not dispute the principal sent the email.[7] It also admits that the Gideons were present at NRE on the alleged date

---

[6]    M.B. seeks to hold the principal, Charles Frazier, in civil contempt for permitting the prayer and participating in it at the ACT Ceremony. Plaintiff argues that as the "overseer," the principal "had an independent duty to ensure that his own actions were in compliance with the Agreed Judgment." Docket No. 96, at15.

Following the ceremony's script, Principal Frazier sat on the stage with principals from other high schools within the School District and recognized the students from Northwest Rankin High School when their names were called. Even though he is the principal of M.B.'s school, he certainly is no more liable than the superintendent and other district officials who also participated in the program. The facts do not establish that Frazier had any particular control over directing the activities. Nor do they show that his actions were any more egregious than the other district officials. Accordingly, the Court finds that Frazier should not be held personally liable for contempt.

[7]    Supplemental exhibits offered by Plaintiff  illustrate that this not the first time that the District engaged in Bible distribution. Similar intrusions on students' education had been authorized at other schools within the District, and district officials, including those in the central office were aware of it. *See* Docket No. 90, at 11 (letter from American United for Separation of Church and State informing the District that it had received a complaint that Gideons distributed bibles at Oakdale Elementary and requesting that it take steps to ensure similar incidents do not occur in the future). The District was placed on notice that there were those who expressed concern with it entangling itself in religious matters long before the instant lawsuit and the entry of the Agreed Judgment. The fact that this Gideon Bible

distributing Bibles to fifth-graders from a designated hallway. *See* Docket No. 93, at 2 (Defendants state they "would vigorously defend any contention" that the purported conduct is unconstitutional). Still, absent any case authority to support its position, the District boldly maintains that the distribution of Gideon Bibles at NRE did not violate its Religion Policy or the First Amendment. The arguments presented by the District are unpersuasive and disregard well-settled law.

The Fifth Circuit has long held that it is unconstitutional for public schools to *allow* Gideons to distribute Bibles to students on school property during school hours. *See Meltzer v. Bd. of Pub. Instruction of Orange Cnty., Fla.*, 577 F.2d 311, 317 (5th Cir. 1978) (holding that the school allowing Gideons to distribute Bibles to those students who indicated they were interested in receiving them manifested a "predilection to encourage particular religions and in doing so to promote most particularly the aims of the Gideon movement"). Other courts have held similarly. *See, e.g.*, *Berger v. Rensselaer Cent. Sch. Corp.*, 982 F.2d 1160, 1171 (7th Cir. 1993) (finding an Establishment Clause violation where the Gideons were allowed to distribute Bibles to fifth-grade students); *Chandler v. James*, 985 F. Supp. 1094, 1102 (M.D. Ala. 1997) (holding that the practice of allowing Gideons to distribute Bibles to students during homeroom period violated the Establishment Clause); *Doe v. South Iron R-1 School Dist.*, 453 F.Supp.2d 1093 (E.D. Mo. 2006) (granting preliminary injunction against school district enjoining them from allowing the Gideons to distribute Bibles to elementary school children on school property at any time during the school day). Even absent the connection of any particular religious group, Bible distribution at public schools is intrinsically unconstitutional because it "interfere[s] with the rights of parents to raise their children according to family religious traditions." *See Schempp,* 374 U.S. at 226. In the face of this precedent, the District advances the erroneous position that, because school

distribution was coordinated and orchestrated by the NRE school principal demonstrates the District's indifference to these concerns.

officials did not personally distribute the religious manuscripts, the practice complied with Establishment Clause principles.

The Court's analysis of this issue is also guided by the *Lee v. Weisman* "coercion test." 505 U.S. at 587. Assisting with the distribution of Bibles to students at school, during school hours, is unconstitutionally coercive. Although the District contends the school's involvement was passive and separate from the Gideons' Bible distribution, context renders this argument flaccid. The District is not able to dissociate itself from the challenged activity.

Coercion exists when "the government imposes pressure upon a student to participate in a religious activity." *See Peck v. Upshur County Bd. of Educ.,* 155 F.3d 274, 287 (4th Cir.1998) (citation omitted). Here, the fact that the students involved were fifth-graders is significant to the analysis. In general, young children are impressionable; therefore, introducing a particular belief to groups of fifth-graders can be extremely persuasive. *See, e.g., Lee*, 505 U.S. at 592 (noting the Court's history of displaying "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools"); *Peck*, 155 F.3d at 288 n* (finding that a policy permitting nonstudents to disseminate religious materials in public schools was coercive as to elementary schools "because of the impressionability of young elementary-age children").

Also, the fact that the Bibles were distributed by Gideons and not by teachers is an inconsequential distinction because, through the eyes of a child, activities conducted at school are naturally viewed as school-sanctioned events. *See Berger*, 982 F.2d at 1166 ("A ten- or eleven-year-old fifth grader cannot be expected to make subtle distinctions between speakers or instructors invited by the [school] and those whose invitations are self-initiated, even assuming the children were told how the Gideons arrived in their classrooms."). The NRE students suffered undue and unconstitutional coercion as they did what was expected of them daily --

obey the instructions of the teachers. *See id*. n. 7 (noting that Gideons may prefer soliciting at schools "because it gives the Bible distribution an official quality").

Even if none of the teachers with the District actually handed a Bible to a child or instructed that the child pick one up from the tables, being led with their classmates to the area where the Gideons awaited their arrival was suggestive enough by itself to exhibit coercion. What fifth grader, who is lead to the Gideons by his teacher, would view as optional the receipt of a Bible thrust upon her by those Gideons? Certainly, no reasonable fifth grader. *See Meltzer v. Bd. of Pub. Instruction of Orange Cnty., Fla.,* 577 F.2d 311, 315 (5th Cir. 1978) (reasoning that with the distribution of Bibles at school, "children cannot help but view the school system's formal tolerance of [the practice] as the placement of the community's imprimatur on this particular movement"). A reasonable fifth grader would also succumb to peer pressure. While her friends "freely" accepted the Bibles, a fifth-grader, who may have harbored an objection, also would accept one rather than be teased, questioned or criticized by her classmates. This dynamic coupled with being lead to the Gideon table by her teacher is tantamount to a teacher placing a Bible in the hands of each student in the classroom. *See Meltzer v. Bd. of Pub. Instruction of Orange Cnty., Fla.*, 548 F.2d 559, 575 (5th Cir. 1977) *on reh'g,* 577 F.2d 311 (5th Cir. 1978) (reasoning that, even though Gideon Bibles were given only to students whose parents signed confirmation slips, "pressures would be exerted upon non-conforming pupils, thus creating an unconstitutional preference") (citation omitted).

The District points to the disclaimers placed on the tables where Bibles were being distributed. Such an argument is patently misguided as the disclaimers were not enough to deflect the perception that the school endorsed the Gideons' belief. School officials do not have to personally distribute or author materials for the District to be liable for implicitly advancing or endorsing the viewpoints contained therein. *See Cnty. of Allegheny v. Am. Civil Liberties Union*

*Greater Pittsburgh Chapter*, 492 U.S. 573 (1989) *abrogated on other grounds by Town of Greece*, 134 S. Ct. 1811 (finding that the fact that a crèche exhibited a sign disclosing its ownership by a Roman Catholic organization did not alter the conclusion that it sent a message that the county supported Christianity).

Furthermore, the District, which has an almost singular function of educating children of all ages, should recognize that it is unreasonable to believe a disclaimer would accomplish a detachment between the teachers who led them there and the Christian organization distributing Bibles. *See Peck,* 155 F.3d at 287 n.* (noting that to elementary-age children the practice of distributing Bibles is more readily "(mis)perceived as endorsement rather than as neutrality" because they are "unable to fully recognize and appreciate the difference between government and private speech—a difference that lies at the heart of the neutrality principle").

Does the District really expect the fifth grade students to read the signs and placards on the table and also discern their meaning? In fact, based on the District's previous arguments, there is uncertainty as to whether the teachers were even capable of understanding the placards' purpose, since the same teachers, administrators and school officials apparently do not understand the District's easily discernible Religion Policy or the First Amendment's Establishment Clause. The mandate is simply "governmental neutrality between religion and religion, and between religion and nonreligion." *McCreary County v. American Civil Liberties Union*, 545 U.S. 844, 125 (2005).

The express order from their principal directing the teachers to march their students through the area exclusively manned by the Gideons, coupled with the age of children, not only proves that the District ignored the Religion Policy, but that it deliberately went out of its way to entangle Christian indoctrination in the education process. Those actions were egregious and in violation of the Agreed Judgment.

In order to protect the sanctity of its decree, the legal process and the children attending the Rankin County School District, the Court finds that Defendant is in contempt of court for allowing the Gideons to distribute the Bibles on campus during school hours and by forcing the students to march through the area where the Gideons were stationed. The evidence is clear, direct, weighty and convincing. *See Test Masters*, 428 F.3d at 582.

## IV. Conclusion

The District has not complied with the Court's order. Under the Agreed Judgment, M.B. acquiesced to not pursue her lawsuit with the pledge that the District, in turn, would ensure future compliance with the provisions of its newly adopted policy on religion. That was the quid pro quo. Defendant failed to honor its end of the agreement. The District's breach did not take very long and it occurred in a very bold way. Its conduct displays that the District did not make any effort to adhere to the Agreed Judgment.

From the accounts detailed in the record, it appears that incorporating religious script and prayers with school activities has been a long-standing tradition of the District. Understandably, eradicating practices, which over time have been systemically engrained in an institution's culture is a task that requires time. But the first step to take must be one which informs all employees of a new policy. When the policy is breached, district officials should take corrective action. In the Court's view, the District has not made any cognizable efforts to comply with the Establishment Clause or its own Religion Policy. On the contrary, it has acted in clear defiance of the law. A contempt finding is appropriate.

Therefore, IT IS ORDERED that: (1) Defendant School District shall pay the Plaintiff $2,500 to compensate her for the deprivation of her constitutional rights at the 2014 ACT Ceremony; (2) Defendant School District shall pay the Plaintiff an additional $5,000 for exposing the violation at NRE where the Gideons were allowed to distribute Bibles on the

elementary school's campus; (3) Defendant School District shall pay a fine of $10,000 per infraction to the Plaintiff for any future violations of the Consent Decree; (4) Defendants shall award Plaintiff's counsel reasonable attorneys' fees and costs in connection with this proceeding, the amount to be determined upon a separate motion filed in this Court within 21 days of this Order; (5) Defendants are permanently enjoined from including prayer or religious sermons in any school-sponsored event including but not limited to assemblies, graduations, awards ceremonies, athletic events and any other school event subject to the limitations set out in the Equal Access Act, 20 U.S.C. § 4071 et seq.; and (6) Defendants are required to comply with the terms of the Consent Decree.

SO ORDERED, ADJUDGED AND DECREED, this the 10th day of July, 2015.


s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE